UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-----------------------------------------------------x

HSB GROUP, INC.,                              :

        Plaintiff,                         :

        vs.                                :        No. 3:04cv2127(SRU)

SVB UNDERWRITING, LTD.,                       :

        Defendant.                         :

-----------------------------------------------------x

RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

       This insurance coverage dispute arises out of an explosion that originated in the boiler

room at the Clara Barton Convalescent Center (the "Nursing Home") in Flint, Michigan, on

November 10, 1999.  The explosion destroyed the Nursing Home and caused the deaths of five

people and injured numerous others.   The explosion was caused by a natural gas leak, but the

precise cause of the gas leak remains unknown.

       Numerous personal injury and wrongful death lawsuits were filed in Michigan state court,

including seventeen suits alleging, *inter alia,* negligence by HSB Group, Inc. ("HSB") in its

inspection of the boiler, and one subrogation suit by the Nursing Home's property and casualty

insurer against HSB (the "Lawsuits").  In 2004, HSB settled the personal injury and wrongful

death suits on the eve of trial for $7.35 million.[1]  HSB now seeks to recover the settlement

amounts from SVB Underwriting, Ltd. ("SVB") under an extended reporting period insurance

policy (the "Policy") issued after the explosion and effective as of December 1, 2000.  SVB has

denied coverage based upon a prior knowledge exclusion in the Policy and HSB's failure to

---

[1] Two years later, HSB resolved the subrogation suit through arbitration for $1.3 million.

disclose the claims prior to issuance of the Policy.

HSB then filed this action, invoking diversity jurisdiction under 28 U.S.C. § 1332.  HSB seeks compensatory damages for SVB's alleged breach of contract and a declaration, pursuant to 28 U.S.C. § 2201, of the rights and legal obligations of HSB and SVB under the Policy.  SVB answered the complaint and asserted an eight-count counterclaim seeking reformation of the Policy to exclude coverage for all claims arising out of the explosion[2] and for various other forms of declaratory relief.  The parties filed cross-motions for summary judgment.  HSB has moved for summary judgment on all counts of its Second Amended Complaint and all eight counts of SVB's Counterclaim [Doc. # 123 ].  SVB has cross-moved for summary judgment on Counts I through VII of its Counterclaim [Doc. # 118].

<u>Standard of Review</u>

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).   In considering a motion for summary judgment, this court is required to view the evidence in the light most favorable to the nonmoving party and to resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court's function is not to resolve disputed factual issues but rather to determine if there exists a genuine issue for trial.  *Id.* at 249.  The party seeking summary judgment bears the burden of showing that no genuine issue of material fact exists.  *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196,

---

[2]  As discussed more fully below, SVB also asks that I strike an amended exclusion in the Policy.

202 (2d Cir. 1995). The substantive law governing the case identifies those facts that are material on a motion for summary judgment. *Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Once a motion for summary judgment has been properly made and supported, the non-moving party may not rely on mere allegations or denials in the pleadings. Rather, "its response must – by affidavits or as otherwise provided in [Rule 56] – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see Anderson*, 477 U.S. at 256.

When cross-motions are presented to the court, the same standard is applied as in the case of individual motions for summary judgment. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Id.*; *see also Make the Road by Walking, Inc. v. Turner*, 378 F.3d 133, 142 (2d Cir. 2004); *Scholastic, Inc. v. Harris*, 259 F.3d 73, 81 (2d Cir. 2001). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993); *see also Otis Elevator Co. v. Factory Mut. Ins. Co.*, 353 F. Supp. 2d 274, 279 (D. Conn. 2005). Rather, summary judgment should not be granted "unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed." *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.

1975); *see also Green Party of Conn. v. Garfield*, 590 F. Supp. 2d 288, 299-300 (D. Conn. 2008).

Facts[3]

The Parties and Insurance Policies at Issue

HSB is a Connecticut corporation with its principal place of business in Hartford, Connecticut.  HSB is in the business of providing equipment and machinery breakdown insurance, other specialty insurance and reinsurance products, inspection services, and engineering consulting services to its customers.  It is one of the largest equipment and machinery insurers in the United States.  Equipment insurance coverage, such as that offered by HSB, is often purchased to complement property and casualty insurance, because property and casualty policies often exclude coverage for equipment breakdowns.  Additionally, in connection with its issuance of equipment breakdown policies, HSB conducts boiler and pressure vessel certification inspections of insured equipment in accordance with applicable state and city codes. Those inspections are commonly referred to in the industry as "jurisdictional inspections."  HSB performs approximately 500,000 jurisdictional inspections a year.

For a number of years, HSB issued equipment breakdown policies to Clara Barton Terrace Home.  Those policies insured against certain losses at the Nursing Home caused as a direct result of an "accident" to "covered equipment," including the Nursing Home's cast iron heating boiler (the "boiler" or the "heating boiler") and two hot water boilers.[4]  In 1999, HSB

---

[3]  The factual statements in this section are undisputed unless otherwise noted.

[4]  The two hot water boilers that provided hot water to the Nursing Home were never an issue in the underlying Lawsuits.  Accordingly, all references to the "boiler" are to the cast iron heating boiler which provided heat to the Nursing Home.

4

issued policy number FBP2249697 (the "Equipment Breakdown Policy") (Pl.'s Summ. J. Ex. E),

which was in effect at the time of the explosion.  In connection with the insurance policies issued

to the Nursing Home, and pursuant to the laws and regulations of the State of Michigan,[5] HSB

conducted jurisdictional inspections of the Nursing Home's heating boiler.  The last such

inspection was performed by HSB's inspector, Herbert Wathan, on November 24, 1998, nearly

one year prior to the explosion.  Wathan reported that the boiler was not leaking.[6]  Reinspection

Report - All Boilers dated 11/24/98 (Pl.'s Summ. J. Ex. F).  The boiler operated without incident

during the entire heating season following the November 1998 inspection.  After that inspection,

no representative of HSB returned to the Nursing Home prior to the explosion.

From the late 1980s through December 1, 2000, HSB maintained "claims-made"[7] errors

---

[5]  SVB denies that HSB's inspection conformed to the laws and regulations of the State of
Michigan.  That issue, however, is not material to the resolution of the summary judgment
motions.

[6]  Wathan did note that the boiler's pressure temperature gauge needed to be replaced,
but that repair was made prior to the explosion.

[7]  The Connecticut Insurance Department Regulations define a "claims-made" policy as

> an insurance policy . . . that covers liability for injury or damage
> that the insured is legally obligated to pay (including injury or
> damage occurring prior to the effective date of the policy, but
> subsequent to the retroactive date, if any), arising out of incidents,
> acts or omissions, as long as the claim is first made during the
> policy period or any extended reporting period.

Conn. Agencies Regs. § 38a-327-1(a) (2009).  As discussed in *American Home Assurance Co. v.
Abrams*, 69 F. Supp. 2d 339, 346-47 (D. Conn. 1999), such a policy has the distinct advantage
for the insurer of providing certainty that when the policy period ends without a claim having
been made, the insurer will be exposed to no further liability.  The major drawback from the
insurer's standpoint is that it may face exposure for wrongful acts performed in the past and,
therefore, it is not uncommon for claims-made policies to limit the time period of coverage for
wrongful acts by including a retroactive date.  Additionally, to ensure that only risks from

and omissions professional liability insurance through the Lloyd's of London insurance market, to cover, among other things, potential risks arising from or relating to its jurisdictional inspection activities.  During this time period, Jean Cooper, HSB's insurance agent and – after 1990 – its risk manager, was responsible for obtaining HSB's professional liability insurance. Cooper did so through Dan Barton, a London insurance broker with Cooper Gay & Company, Ltd. ("Cooper Gay & Co.").  In 2000, for business reasons relating to AIG's acquisition of HSB, instead of buying another such policy, HSB opted to purchase extended reporting period coverage, also referred to as "tail" or "run-off" coverage,[8] subscribed to by a number of underwriting syndicates at Lloyd's of London.[9]  The purpose of the extended reporting period insurance was to cover claims that would have been covered under the regular claims-made term policy but which came to light after the end of the term.  HSB's expiring claims-made policy, Policy No. 738/UU048250T (Pl.'s Summ. J. Ex. T), effective September 1, 1999, to November 1, 2000, was extended to December 1, 2000, and thereafter certain underwriters ("the Underwriters") issued the Policy, No. 738/UU048250U (Pl.'s Summ. J. Ex. A), to HSB for the

_____

unknown losses are insured, claims-made policies are generally written to exclude coverage for claims arising out of "negligent acts or omissions known to the insured prior to policy inception, notwithstanding that the claim is made during the policy period."  Mark Wade & Patricia Essoff, *Lawyers Professional Liability: A Primer on Prior Knowledge,* 30 The Brief 29, 35 (Fall 2000).

[8]  Tail coverage is generally purchased from the expiring claims-made insurer and is intended to allow a policy-holder to report third-party claims that arise after the claims-made policy expires.  *See ITC Investments, Inc. v. Employers Reinsurance Corp.,* No. CV 98115128, 2000 WL 1996233, at **15-16 (Conn. Super. Ct. Dec. 11, 2000).

[9]  Although many of the syndicates subscribing to the 1999-2000 policy also subscribed to the extended reporting period Policy and bore approximately 80% of the risk, two syndicates were not on the prior policy, and several of the "overlapping" syndicates, including SVB, took on larger shares when they subscribed to the new Policy.

policy period December 1, 2000, through December 1, 2005.   The Policy provided HSB with

$35 million in errors and omissions insurance coverage, inclusive of defense costs, in excess of

HSB's self-insured retention amount of $5 million.  SVB, organized under the laws of England

with its registered office and principal place of business in London, is an underwriting member

of the lead syndicate, Syndicate 1241, underwriting the Policy.[10]

The Nursing Home Explosion and Investigation

On November 10, 1999, an explosion occurred inside the boiler room at the Nursing

Home, destroying a substantial portion of the Nursing Home and, as noted above, killing five

people and injuring numerous others.  The following day, Voss Insurance Services, the Nursing

Home's insurance agency, faxed to Dennis Dobranksy, the Claims Manager for HSB, a property

loss notice, which described the loss at the Nursing Home as a "steam boiler explosion, building

destroyed, several people dead, others missing."  Property Loss Notice dated 11/11/99

(Dobransky Dep. Ex. 103).  HSB assigned a claim number to the Clara Barton Nursing Home

file.  *Id.*

Stephanie Watkins, then in-house counsel for HSB, along with Thomas Mochnick,

HSB's Vice President and Litigation Counsel, learned of the explosion on November 11, 1999.

Watkins heard that a boiler had exploded at the Nursing Home and that there were several

injuries and/or deaths.  She immediately retained outside counsel, Dennis Withers, to represent

---

[10]   For purposes of this litigation, the parties have stipulated that any judgment or verdict against SVB shall be binding upon and have the same force and effect with respect to all of those "Certain Underwriters" at Lloyd's who severally subscribed to the Policy, but only to the extent of each such Underwriter's several share of its syndicate's proportion of any loss payable under the Policy, and that any judgment or verdict in favor of SVB shall be binding upon HSB as if such judgment or verdict were in favor of all of those Certain Underwriters.  Thus, throughout this ruling, the "Underwriters" and SVB are used interchangeably.

HSB's interests in connection with the explosion and to address insurance coverage issues that might arise in connection with the Equipment Breakdown Policy HSB issued to the Nursing Home.  On November 12, 1999, Withers retained an expert, George Theus, on behalf of HSB to determine the cause of the explosion and to rule out a boiler explosion.  Email dated 11/12/99 from Withers to Theus (Dobransky Dep. Ex. 78).  HSB admits that, in the days following the explosion, it recognized the possibility that it might face a lawsuit for negligent inspection of the boiler based on the reports of a boiler explosion.

The day following the explosion, HSB's boiler inspector, Robert Oshnock, was advised by the assistant boiler inspector for the State of Michigan that the boiler was virtually intact except for a portion of the boiler's circulating pipe, which appeared to have been broken off by falling debris.  Notes dated 11/11/99 by Oshnock (Pl.'s Summ. J. Ex. I).

The Chief of the Boiler Division of the Michigan Department of Consumer and Industry Services prepared a Boiler Accident Investigation Report regarding the inspection on November 11, 1999.  That report indicated that the boiler had been turned off early on the morning of November 10th because the outdoor temperature was going to be in the upper 60s.  Maintenance personnel worked on air-conditioning equipment in the boiler room during the early afternoon of November 10th.  At approximately 3:30 p.m., a gas odor was reported to the maintenance manager but, after investigating, he was unable to detect an odor.  At approximately 7:00 p.m., the boiler was turned on, and at approximately 8:41 p.m., an explosion occurred in the boiler room.  The State inspector reported that the covering or outer skin of the hot water boiler was detached, indicating that an explosion had occurred in the furnace chamber.  The inspector reported that the cast iron sections of the boiler vessel were not damaged by the explosion, and

8

the boiler vessel itself remained intact.  He also observed that two nozzles had been broken by debris and noted that the boiler support pedestal had been crushed by falling debris and that the boiler was resting on the burners.  His conclusion was that the heating boiler boundary was not ruptured.  Boiler Accident Rpt. at 2 (Pl.'s Summ. J. Ex. J).

In the days and weeks following the explosion, Claims Manager Dobransky visited the site three or four times.  Within a week of the explosion, he photographed the boiler in the Nursing Home basement and concluded that it was intact and had not exploded.  On December 1, 1999, he performed an inspection of the boiler to determine whether a boiler explosion had occurred.  He observed that the boiler was intact except for some broken pieces and that it had shifted off its foundation and was listing downward about five degrees, probably due to the tons of debris that had fallen on it.  While inspecting the boiler, he spoke with a city plant building inspector, Ken LaBelle.  LaBelle suggested that Nursing Home personnel working on the chiller unit the day of the explosion may have sprayed water onto one of the pilot lights, which then went out.  When the boiler cycled on, the accumulated gas from the extinguished pilot light ignited, causing the boiler to shift off its foundation, which then broke the gas main.  Dobransky concluded, based on his observations and the information that he received from the hired consultants, that the cause of the explosion was a natural gas explosion, not an explosion from the interior of the boiler vessel caused by a buildup of steam or water pressure.  Having concluded that the explosion was not a steam or water pressure explosion, Dobransky was not concerned with the specific cause of the explosion.  He testified that it would have been extremely unlikely for a boiler of this type to explode because it was a hot water boiler, not a steam boiler, and it was designed with a safety relief valve, which would have relieved any

pressure buildup unless the valve was faulty.   (Dobransky Dep. 49.)

On December 10, 1999, Dobransky received a letter from an attorney concerning an upcoming inspection of the boiler.  Dobranksy forwarded the letter to Withers, commenting on the fax cover sheet, "Looks like people are still looking at the boiler as the likely source of the gas explosion." (Dobransky Dep. Ex. 96.)   He suggested that they might want to send in their expert to take another look at the boiler.  *Id.*

On January 11, 2000, the Michigan Department of Consumer and Industry Services issued its Investigation Report, concluding that "[t]he hot water heat boiler pressure boundary was not ruptured in the explosion."   Boiler Accident Rpt. at 2 (Pl.'s Summ. J. Ex. J).  Following that report, several local newspapers reported that state investigators had concluded that the three boilers at the Nursing Home were not the cause of the explosion. (Pl.'s Summ. J. Ex. K, L.)  One newspaper quoted a tort plaintiff's counsel as stating that "[t]he explosion was caused by excess buildup of natural gas in the building. . . . Either there was a failure in the gas piping in the building or it was the failure of a gas appliance."  Bryn Mickle, *Boilers ruled out in blast,* The Flint Journal, Jan. 12, 2000, at A1, A8.

Nevertheless, inspection and testing of the boiler, among other things, continued.  In early February, Dobransky, as well as numerous other parties, received a fax from Consumers Energy, the local utility company, regarding "[c]ontinued observation/testing of evidence items," including the boiler equipment.  (Dobransky Dep. Ex. 108.)   Jack Voss, President of Voss Insurance Services, also received that fax and left a telephone message for Dobransky suggesting that they should be there for the inspection.  (Dobransky Dep. Ex. 109.)

On February 23, 2000, Dobransky received a letter from Scott Feringa, counsel for

Consumers Energy, requesting, *inter alia,* copies of all documents pertaining to inspections of the three boilers at the Nursing Home by HSB.  Ltr. dated 2/18/00 from Feringa to Dobransky (Dobransky Dep. Ex. 110).  Dobransky forwarded the letter to Withers and HSB's in-house counsel.  Facsimile Msg. dated 2/24/00 (Dobransky Dep. Ex. 110).

Four days later, Nancy Fisher, an adjuster for The St. Paul Companies, the property and casualty insurer for the Nursing Home, wrote to Dobransky, advising him that to date St. Paul had made advance payments of $420,000 and was continuing to investigate the cause of the explosion.  "The intent of this letter is to notify [HSB] that we may seek reimbursement for the amount of loss paid under The St. Paul insurance policy, in whole or in part."  Ltr. dated 2/27/00 from Fisher to Dobransky at 1 (Dobransky Dep. Ex. 111).   In an attached memorandum,  Fisher proposed that nine "interested parties," including St. Paul, HSB, the boiler and hot water heater manufacturers, Consumers Energy, the local service company, and several other insurers, share on a pro rata basis the expenses associated with the investigation of the explosion.  Mem. dated 2/27/00 from Fisher to Dobransky at 1 (Dobransky Dep. Ex. 111).

On March 1, 2000, Dobransky sent Voss Insurance Services, the Nursing Home's insurance agency, a denial-of-coverage letter.  He stated that, after an investigation, HSB had determined that the cause of the explosion was an accumulation and ignition of natural gas and, therefore, HSB was denying coverage under the Equipment Breakdown Policy.   The letter provided in relevant part:

> A catastrophic combustion explosion occurred at [the Nursing Home].  The cause was due to the accumulation and ignition of natural gas.  The explosion resulted in significant damage to the building and contents.  Our investigation has found that the three boilers are intact, except for damage caused by falling debris from

the combustion explosion.

Please refer to the attached policy exclusionary wording. Exclusion B.1.h. states, "We will not pay for loss or damage caused by or resulting from: Fire or combustion explosion, whether or not caused by or resulting from an 'accident.'" Therefore, we must deny any and all liability in connection with this occurrence.

Ltr. dated 3/1/00 from Dobransky to Voss (Dobransky Dep. Ex. 105).  HSB's coverage denial was never disputed by the Nursing Home.

On March 9, 2000, Dobransky received from Consumers Energy a schedule of upcoming inspections that included the boiler components, among other things.  The following day, he learned that the Nursing Home had requested a copy of HSB's last inspection report on the boiler.  Withers advised him to "[h]old all parties off regarding the requests for copies of inspection reports."  Phone Msg. dated 3/13/00 to Dobransky (Dobransky Dep. Ex. 116).  After discussing the issue with Watkins in the legal department, Withers advised Dobranksy to turn down the requests for HSB's inspection reports, noting their concern with the one report that mentioned the pressure gauge,[11] and to suggest that the requesting parties obtain the reports from the State of Michigan.  Over the next few months, Dobransky continued to receive copies of correspondence from various attorneys, including tort plaintiffs' counsel, regarding the on-going investigation and inspection of the boiler components with requests for copies of HSB's inspection reports.  Most of that correspondence he forwarded to Watkins in the legal department, as well as to Withers.

On April 25, 2000, Withers sent Watkins what he, at the time, anticipated would be his firm's final statement for services rendered in connection with the explosion.  His cover letter

---

[11]  *See* Note 6, *supra*.

stated:

> Every indication we have indicates this was a natural gas explosion
> which did not rupture the pressure retaining portions of either of
> the two boilers HSB insured at this location.  Assuming that this is
> accurate it seems unlikely that HSB would be named as a
> defendant in any future lawsuits.

Ltr. dated 4/25/00 from Dobransky to Withers (Ambridge Dep. Ex. 43).

The boiler inspection ultimately took place on June 22, 2000, with over forty parties in attendance, including various tort plaintiffs' counsel, although HSB did not attend.  Withers, in HSB's legal department, was made aware of the inspection activities as they were taking place.

In September 2000, the Nursing Home's counsel requested copies of Dobransky's explosion investigation photographs.  On the advice of Withers, Dobransky forwarded copies to the Nursing Home's attorney.  (Dobransky Dep. 125-26 & Ex. 131.)  That same month, Consumers Energy took possession of a number of boiler parts that had been stored off-site for metallurgical testing, subject to an evidence preservation agreement.  Included in the items taken were a number of boiler burner pieces as well as the boiler support.  Dobransky testified that he did not inquire why those particular pieces were being tested, because that was beyond the scope of his investigation, which had already been concluded.  He faxed a copy of the list of parts and an addendum to the evidence preservation agreement to Withers in HSB's legal department. (Dobransky Dep. 127-28 & Ex. 133.)

In November 2000,  Dobransky received a letter from "Records Deposition Service, Inc.," addressed to "Dear Deponent," asking for a copy of HSB's entire insurance file pertaining to the Nursing Home.   (Dobransky Dep. Ex. 134.)  The letter did not indicate on whose behalf those records were being requested, and Withers advised him not to provide anything at the time.

(Dobransky Dep. Ex. 135, 136.)

The Lawsuits Against HSB

In March 2001, three lawsuits were filed against HSB and other defendants.  Two were

wrongful death cases and one was a personal injury suit brought by an employee of the Nursing

Home, alleging negligent inspection of the boiler and boiler supports.  This was the first time

anyone had alleged that HSB's inspector had been negligent in the performance of the

jurisdictional inspection of the boiler.  Between September 2001 and July 2002, another fourteen

wrongful death and personal injury lawsuits (the "Lawsuits") were filed against HSB and others.

Dobransky testified that he was not surprised that the Lawsuits were filed.  "Well, you have

people killed and injured, someone is looking for a deep pocket, whether it is us or St. Paul

Insurance or someone else." (Dobransky Dep. 144.)  Withers was retained as litigation counsel

for HSB and began billing HSB for his fees and expenses, commencing in March 2001.

On November 8, 2002, St. Paul filed a subrogation suit against HSB, seeking

approximately $4.5 million in property losses as a result of HSB's negligent inspection of the

boiler supports.

The complaints in the Lawsuits alleged that HSB's inspector had been negligent in his

1998 jurisdictional inspection of the equipment at the Nursing Home when he failed to observe

and report that the metal stand on which the boiler rested was rusted and failed to report these

deficiencies to the Nursing Home and appropriate governmental agencies.  (Attachs. to Black

Aff.)  The theory was that the stand collapsed, setting in motion a chain of events that resulted in

a crack in a natural gas pipe, leading to an accumulation of natural gas that exploded.  HSB took

the position that, under Michigan rules and regulations on boiler inspections, the stand was not

within the scope of the boiler inspection.  HSB considered that position significant from a

liability standpoint, for a failure of a component that HSB did not inspect and was not required to

inspect should not give rise to any liability on HSB's part.

Three years later, in 2004, one of the tort plaintiffs' retained experts opined for the first

time that the boiler had been leaking for ten years before the explosion, setting off the chain of

events that culminated in the explosion, thus blaming HSB for the explosion.  Additionally, there

was new testimony that the boiler stands were, in fact, part of a jurisdictional inspection, contrary

to earlier testimony from two State officials.  As a result of this new theory of liability and the

testimony concerning the boiler stands, as well as outside counsel's assessment that HSB had

become "the target defendant" (Watkins Aff. ¶ 10), HSB became concerned that its potential

liability could exceed the Policy's $2 million reporting threshold.[12]   In March 2004, HSB

instructed its broker, Cooper Gay & Co., to place Underwriters on notice of the Lawsuits.  Ltr.

dated 3/16/04 from Cooper to Barton (Pl.'s Summ. J. Ex. Y).  The Lawsuits were scheduled for

trial commencing on September 8, 2004.  Shortly before trial, HSB settled all of the personal

injury and wrongful death suits for $7.35 million.

---

[12]  The Policy contained a Notice provision that stated:

> VI.  NOTICE AND INTERRELATED CLAIM CLAUSE
>
> A.  The Insureds shall, as a condition precedent to the obligations
> of Underwriters under the Policy, report during the Policy Period
> any Claim which exceeds or appears likely to exceed the sum of
> U.S.D. 2,000,000 from the ground up.

(Policy § VI (A).)  At the time HSB put SVB on notice of the Lawsuits, its defense costs to date
were approximately $600,000, well below the $2 million threshold.  SVB concedes that "this is
not, and never has been, a late notice case."  (Def.'s Mem in Opp'n to Summ. J. 2.)

The St. Paul subrogation action was scheduled for trial in January 2006.  Ultimately, HSB and St. Paul agreed to arbitrate their dispute.  The arbitration took place in June 2006 over a period of ten days.  The arbitration panel issued an award in favor of St. Paul and against HSB in the amount of $1,931,647.00.  Pursuant to a "high-low" settlement agreement entered into by the parties before the arbitration, HSB paid St. Paul $1.3 million.

Additionally, HSB incurred legal fees and expenses of approximately $2.3 million in defending the Lawsuits and the arbitration proceeding, for which it is also seeking reimbursement under the Policy.

<u>The Coverage Dispute Between HSB and SVB</u>

Dan Barton of Cooper Gay & Co. served as HSB's insurance broker in connection with procuring the Policy.  Toward the end of 2000, as HSB's claims-made policy was expiring,  Jean Cooper, then HSB's Risk Manager, asked Barton to secure "run-off" coverage because HSB was about to be purchased by AIG.  Cooper testified that her intent in obtaining the extended reporting period insurance was to provide "full continuity" with "no gaps" in coverage.  (Cooper Dep. 155.)  Barton understood that HSB's prior coverage was going to be folded into an AIG policy and that HSB was seeking a "run-off" policy that would respond to claims or circumstances taking place prior to the Policy's inception date, December 1, 2000, but which only became known to HSB after that date.  His role was to negotiate the terms with Underwriters on behalf of HSB and obtain the most favorable terms possible for his client.

In November 2000, Barton approached Stephen Burnhope, then the "active underwriter" for one of the syndicates on the expiring policy, to see if he would be willing to be the lead

underwriter for a run-off policy for HSB.[13]   Burnhope agreed.  During the time that the Policy

was being negotiated, Burnhope never had any direct communications with anyone at HSB; all of

his dealings were directly with Barton.  At their second meeting, Barton presented Burnhope with

a "quote slip" on which Burnhope then listed some of the terms and conditions he was offering to

HSB, including premiums for three different policy periods (36, 60, and 72 months).  According

to  Barton, it was anticipated that the wording used in the expiring policy would roll over to the

run-off policy, subject to necessary amendments because it was a run-off policy.  At the bottom

of the "quote slip," Burnhope wrote "Known Claims/Circumstances Exclusion (PTO)."[14]  On the

back he wrote,

> Ex. Claims and Circumstances
>
> (I) known to the office of General Counsel
>
> (ii) identified in the due diligence process and known to HSB;[15]
>
> (iii) known to any director of the Assured or the Assured's principal operating subsidiaries
>
> as at inception hereof.
>
> Actual "policy" wording to be agreed.

---

[13]   There was also testimony that HSB initially solicited an offer for the "run-off" coverage from the leading syndicate on its expiring policy but that the premium was too expensive.   Barton then approached Burnhope with SVB, which was the second largest syndicate on the prior policy.  (Barton Dep. Ex. 21.)

[14]   According to Burnhope, "PTO" meant "please turn over," an instruction to the reader. (Burnhope Dep. 51.)

[15]   The words "and known to HSB" in subsection (ii) were added by Burnhope later in the negotiating process in response to a concern raised by HSB and communicated by Barton to Burnhope.  (Burnhope Dep. 108.)

(Barton Dep. 40 & Ex. 2.)   Barton confirmed that Burnhope was "very keen" that "all claims
and/or circumstances" then known by HSB would be disclosed  to the Underwriters subscribing
to HSB's expiring policy.  (Barton Dep. 40; Burnhope Dep. 70.)  Indeed, in a memorandum to
Cooper dated November 17, 2000, Barton stated:

> Regarding the wording Stephen [Burnhope] confirmed that he will
> give full continuity.  He is not trying to be clever with the known
> claims declaration, he just wants to make sure all <u>known</u> claims are
> notified now under the existing policy.  He has added to 3.b) "and
> known to H.S.B."

(Pl.'s Summ. J. Ex. HH) (underlining in original).

Burnhope testified, however, that his agreement to subscribe to the extended reporting
period Policy was not based on an understanding that notification of known claims would be
made under the expiring policy.  (Burnhope Dep. 72-73.)  Moreover, that notification was
"irrelevant" to his underwriting decision.  (Burnhope Dep. 73.)

During the negotiation process, Barton advised HSB of all of the terms and conditions on
the quote slip, including that Burnhope was requiring that all claims and circumstances known to
HSB be the subject of notice under its expiring policy before it expired on December 1, 2000.
Thus, he instructed HSB to provide a full list of all known claims and circumstances under its
expiring policy because, under the quote slip, they would be excluded under the run-off policy.

As discussed below, HSB's expiring policy contained a provision allowing HSB to obtain
coverage under the expiring policy for a claim that arose after the policy period if HSB provided
notice of a "specific Wrongful Act" prior to the expiration of the policy period.  Thus, Burnhope
testified that it was his desire that "all known claims and circumstances that could give rise to a
claim should be excluded under the policy going forward, and as a consequence it was [his]

18

expectation that those would be notified to the current policy." (Burnhope Dep. 71.) Burnhope described this notice as a "logical corollary" to the known claim/circumstances exclusion he was requiring going forward. *Id.* at 70.

Thus, on November 16, 2000, Cooper ordered "updated claim/incident exhibits" from Watkins in the legal department. Six days later, Cooper sent an email to Barton regarding the run-off policy, stating in relevant part:

> As a "heads up," I alert you to the following:
>
> 1-Our legal department has prepared various exhibits to update Underwriters on all incidents which could possible [sic] give rise to a claim, based on Stephen's desire to be sure anything is reported under the current policy. This will be kept as current as possible until the closing date and then I will forward it to you. This will be an extensive list, however, most everything would not be expected to be a claim under the policy and would not normally have been reported.

Mem. dated 11/22/00 from Cooper to Barton (Burnhope Dep. Ex. 5).

On November 30, 2000, Amy Bassett, who worked in HSB's risk management department under Cooper's supervision, sent Barton an eighteen-page fax with a cover letter stating "Attached are the incident reports Jean advised we would send." Mem. dated 11/30/00 from Bassett to Barton (Burnhope Dep. Ex. 6). The attachment listed several categories of potential or existing claims grouped under the following headings:

- Potential Claims/Complaints Regarding ASME Inspection Services

- Potential Claims/Complaints Regarding Jurisdictional Inspection Services

- Personal Injuries Reported in Connection with Insurance Claim[s]

- Negligence Litigation Pending Against [HSB]

*Id.* The list included a number of explosions, as well as several requests for inspection records, including one in connection with an explosion wrongful death case. *Id.* The list, however, did not contain any reference to the Nursing Home explosion. Watkins, who prepared the incidents list, did not recall why the Nursing Home explosion was not on the list. She did explain that HSB had already ruled out negligent inspection by the time they prepared the list. (Watkins Dep. 108.)

That same day, Cooper Gay & Co. faxed the incidents list to the underwriters on the expiring policy. The underwriters responded that, with respect to the first category (24 notices relating to ASME inspection services), none of the matters constituted a claim within the meaning of the claims-made policy (i.e., a suit, arbitration, or written demand for damages against the insured). With respect to the second category (30 notices relating to jurisdictional inspections), the underwriters accepted only four of the incidents as constituting a claim, those being the ones where it appeared that the insured had received a written demand for damages. Likewise, with respect to the third category (24 notices involving personal injuries), the underwriters accepted only one as a claim, and with the fourth (25 notices of negligence litigation), the underwriters accepted all matters involving actual litigation. The underwriters further rejected HSB's argument that it had provided notice of a wrongful act, which would allow coverage for claims later asserted.

> It is Underwriters' opinion, with respect to none of the matters
> listed in the fax of 30 November 2000, did the insured provide
> Underwriters with written notice necessary to comply with
> Condition VII(B). Condition VII(B) requires the insured to inform
> Underwriters of a specific wrongful act, actual or alleged, of which
> it is aware. At most, the information submitted by the assured with
> respect to any particular matter relates very general allegations and

20

not a specific wrongful act.

Ltr. dated 3/20/01 from Tim Carter to Martin Prew (Pl.'s Summ. J. Ex. JJ).

On December 1, 2000, Cooper Gay & Co. issued HSB an "Insurance Cover Note" advising HSB that it had effected an "Errors and Omissions Insurance, Extended Reporting Period Policy." One of the listed conditions was "Known Claims/Circumstances Exception, wording to be agreed by Underwriters." Ins. Cover Note dated 12/1/00 (Burnhope Dep. Ex. 7). Although the amount of coverage ($35 million), the self-insured retention amount ($5 million), and the Policy Period (December 1, 2000, to December 1, 2005) were agreed to at the time coverage was bound, the actual wording of the Policy was not. On January 5, 2001, Cooper Gay & Co. issued a second cover note listing the Lloyd's syndicates with which coverage had been placed, as well as the general terms, conditions, and exclusions to be included in the policy. HSB was instructed to examine the Insurance Cover Note carefully and to notify Cooper Gay & Co. if it did not comply with HSB's requirements or was materially inaccurate. With respect to the "Known Claims/Circumstances Exclusion," the cover note again provided "wording to be agreed by Underwriters." Ins. Cover Note dated 1/5/01 (Burnhope Dep. Ex. 8).

In early 2001, Cooper Gay & Co. prepared the wording for the Policy and then submitted it to Underwriters, which signified its acceptance on February 27, 2001, by initialing Cooper Gay & Co.'s wording. At the time, Barton believed the wording accurately reflected the intent of both parties to the insurance contract he had negotiated on behalf of HSB. The Lloyd's Policy Signing Office issued the Policy on or about April 19, 2001. The second page of the Policy stated in all capital letters:

THE ASSURED IS REQUESTED TO READ THIS POLICY

>           AND, IF IT IS INCORRECT, RETURN IT IMMEDIATELY TO
>           YOUR BROKER FOR ALTERATION.

(Policy at 2.)

Under the terms of the Policy, the Underwriters agreed to reimburse HSB for a loss "for any Claim first reported by the Insureds during the Policy Period, for a Wrongful Act by the Insureds . . . in the rendering of or failure to render Professional Services, provided such Wrongful Act occurred, or is alleged to have occurred, prior to the 1st December 2000."  (Policy § I - Insuring Agreements.)

The Policy defined "Claim" as:

> 1.  a civil or criminal proceeding, or an administrative adjudicatory proceeding commenced by the filing of a notice of charges or a formal investigative order, in which money damages are sought;

> 2.  an arbitration or mediation proceeding in which monetary damages are sought; or

> 3.  a written demand for monetary damages,

> against the Insureds, including any appeal therefrom.

(Policy § II.A. - Definitions.)

"Loss" was defined as "damages, settlements and Defense Costs."  (Policy § II..G. - Definitions.)

"Wrongful Act" was defined as "any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty, or other act done or wrongfully attempted." (Policy § II.L.- Definitions.)

When issued, the Policy also included in Section III a number of exclusions, including "Exclusion M," which read as follows:

The Underwriters shall not be liable to pay any Loss in connection with any Claim:

M.  or circumstance which could give rise to a Claim

> 1.  known to the office of General Counsel, or

> 2.  identified in the due diligence process and known to HSB Group, Inc., or

> 3.  known to any director of the Insureds or the Insured['s] principal operating Subsidiaries

as at inception hereof, 1st December 2000.

(Policy Excl. M; Burnhope Ex. 10.)  Burnhope testified that the wording of Exclusion M "perfectly" reflected what he had intended to include in the Policy when he made his handwritten notations on the quote slip.  (Burnhope Dep. 113-14.)

On October 17, 2001, HSB first contacted Barton about the Policy's wording.  In an email, Cooper advised Barton that the Policy had three errors (in two of the definitions and in Exclusion L, which are not relevant to this suit) and that she had "concerns over the wording of Exclusion M" that she wanted to discuss with him.  Email dated 10/17/01 from Cooper to Barton (Cooper Dep. Ex. 72).  Her concerns were two-fold.  First, it was not worded according to "common industry standards" and, second, she did not feel that it "totally, accurately reflected the intent of both the underwriters and [herself], and needed a little tweaking for [their] specific business, and how incidents come in."  (Cooper Dep. 151.)  On December 20, 2001, Cooper sent Barton an email regarding, *inter alia*, the rewording of Exclusion M to clarify "the 'circumstances' to be excluded."  Email dated 12/20/01 from Cooper to Barton (Cooper Dep. Ex. 73).  She attached the following suggested revision of Exclusion M, which she had drafted:

The Underwriters shall not be liable to pay any Loss in connection with any Claim:

M.  or circumstance which could *reasonably be expected to* give rise to a Claim

    1.  known to the office of General Counsel, or

    2.  identified in the due diligence process *performed as part of the acquisition by American International Group* and known to HSB Group, Inc., or

    3.  known to any *member of the Board of Directors* of the Insured or the Insured's principal operating Subsidiaries

as at inception hereof, 1st December 2000.

Attachment to Email dated 12/20/01 from Cooper to Barton (Cooper Dep. Ex. 73) (italics added to denote revisions).

    Cooper testified that she did not become aware of the Nursing Home explosion or the Lawsuits until sometime in 2004 and, therefore, did not withhold information about these matters from Underwriters.  (Cooper Dep. 44.)   Likewise, Barton testified he was not aware of the explosion or the Lawsuits against HSB while he was negotiating the terms of the Policy or the amendment to Exclusion M.  (Barton Dep. 133-34.)

    Burnhope had left SVB in September 2001, so the negotiations over HSB's proposed revision to Exclusion M took place between Barton and Richard Peters, another SVB underwriter who had no involvement with the prior negotiations.  Peters, like Barton and Cooper, was unaware of the Nursing Home explosion or any of the Lawsuits.  Peters agreed to the proposed change and, on February 1, 2002, an endorsement to the Policy was issued that retroactively amended Exclusion M as HSB had requested.  Peters testified that, had he been aware of the Lawsuits and that HSB had not given notice of the explosion under its expiring policy, he would not have agreed to the proposed amendment.  (Peters Dep. 84.)

In March 2004, Underwriters first received notice of the Lawsuits, which Cooper Gay & Co. provided at HSB's direction.  During the spring and summer of 2004, Underwriters requested and received from HSB various materials pertaining to the Lawsuits, including pleadings, depositions, witness lists, and HSB's underwriting file for the Policy.  On August 31, 2004, HSB sent Underwriters the incidents list that HSB had provided to Cooper Gay & Co. on November 30, 2000.

On September 7, 2004, one day before trial of the Lawsuits was to commence, Underwriters' counsel sent HSB a letter acknowledging its request for coverage but not confirming coverage.  The letter stated that the Underwriters were conducting an ongoing investigation and set forth a reservation of rights, remedies, and defenses, including the right to deny coverage on the basis of the amended Exclusion M.  The letter requested HSB to provide specific information and documents to assist with the investigation, including documents showing when the constituencies listed in subsections (1), (2), and (3) of Exclusion M had learned about the explosion and what they knew about it.  Ltr. dated 9/7/04 from Black to Watkins at 2-3 (Pl.'s Summ. J. Ex. Z).  Watkins, then Chief Legal Counsel and an officer of HSB, responded in writing on September 24, 2004, advising Underwriters that HSB had settled the pending wrongful death and personal injury lawsuits for $7.35 million.

On December 16, 2004, the instant lawsuit was filed by HSB.

Discussion

## I.  Which Version of Exclusion M Applies?

Before deciding whether coverage for the Lawsuits is barred by an exclusion in the Policy, I must first resolve which version of Exclusion M applies.  That issue arises with

25

consideration of the summary judgment motions addressed to SVB's counterclaims for reformation of the Policy.

A.  Reformation of the Policy to Exclude All Losses Arising out of the Explosion

In Count I of its Counterclaim, SVB seeks reformation of the Policy so that it expressly excludes coverage for all losses, including defense costs, HSB has incurred in connection with all Claims arising out of the explosion at the Nursing Home, including but not limited to the Lawsuits.  Both parties have sought summary judgment in their favor on this count.  The burden of proof on this issue is on the party seeking reformation of the contract, in this case SVB.  *See Lopinto v. Haines,* 185 Conn. 527, 535 (1981).

In Connecticut, a cause of action for reformation rests on the equitable principle that a written instrument that does not reflect the contracting parties' intent should be rewritten where the instrument is the product of either a mutual mistake or a unilateral mistake by one party coupled with actual or constructive fraud, or other inequitable conduct on the part of the other. *Lopinto*, 185 Conn. at 531.  The purpose of reformation is to restate the terms of an agreement when the writing that memorializes it is at variance with the parties' intent.  *Id.* at 532.  To prevail on a reformation claim, a litigant must meet a heightened standard of proof, specifically clear, substantial and convincing evidence that reformation is in order.  *Id.* at 533-34.  Thus, "[w]here fraud is absent, 'it must be established that both parties agreed to something different from what is expressed in writing, and the proof on this point should be clear so as to leave no room for doubt.'" *Id.* at 535 (quoting *Bishop v. Clay Fire & Marine Ins. Co.*, 49 Conn. 167, 172 (1881)).

1.  The Parties' Contentions

SVB seeks summary judgment on Count I of its Counterclaim, arguing that the evidence

of record is clear, substantial, convincing and undisputed that the Lawsuits were precisely the

type of claim the Policy was not intended to cover and that any failure of the current Policy

wording to effectuate that intent was necessarily the product of a mutual mistake or a unilateral

mistake on the part of SVB, coupled with actual or constructive fraud or other inequitable

conduct on the part of HSB.  SVB argues that, because Barton was HSB's agent for all purposes

in negotiating the Policy, HSB is charged with his knowledge and understanding about the terms

and conditions of the Policy and is bound by his actions.  *See McDermott v. Calvary Baptist

Church*, 263 Conn. 378, 384 (Conn. 2003) (holding that "it is a general rule of agency law that

the principal in an agency relationship is bound by, and liable for, the acts in which his agent

engages with authority from the principal, and within the scope of the [agency relationship]")

(internal quotation marks and citations omitted).  Based on the testimony of Barton and

Burnhope, which SVB characterizes as "remarkably consistent," SVB insists that there can be no

doubt that "the Policy was not intended to cover any claim HSB might report during the Policy

period arising from any circumstance which could give rise to a Claim that was known at the

highest levels of HSB" as of December 1, 2000.  (Def.'s Mem. in Supp. of Mot. Summ. J. 20.)

"Indisputably," it asserts, "HSB's representation that it had complied with Burnhope's condition

by reporting under its prior policy all known 'incidents which could possible[sic] give rise to a

claim,' was not true" because both Withers and Watkins in HSB's legal department knew of the

explosion.  (Def.'s Mem. in Supp. of Mot. Summ. J. 24.)   Thus, it reasons, when Barton and

Burnhope finalized the Policy's wording in early 2001, they were operating under a mutual

mistake of fact – *i.e.*, that HSB had complied with Burnhope's condition by reporting all known circumstances which could possibly give rise to a claim under its expiring policy – and that their mutual mistake of fact warrants reformation of the Policy.  Alternatively, SVB claims that it was operating under a unilateral mistake of fact because it believed that HSB had reported everything under the expiring policy, when in fact it had not done so, despite Cooper's fraudulent representation to Barton to the contrary.

HSB responds that there is no evidence to support SVB's contention that, due to a mutual mistake, the Policy failed to express the true intent of the parties, namely that all prior incidents had been reported.  Although certain people at HSB, including several people in its legal department, were aware of the Nursing Home explosion, they had ruled out any liability on the part of HSB for negligent inspection and, therefore, did not feel a need to include the explosion on the incidents list.  (Watkins Dep. 113.)  Moreover, the evidence is undisputed that Cooper did not learn of the Nursing Home explosion until 2004.  She was the only person at HSB who was involved in procuring the Policy and she was the person who sent the email to Barton about the incidents list.  HSB argues that, given her lack of knowledge of the explosion, she could not have intended to deceive the Underwriters, which is required to show fraud. HSB also argues that SVB did not rely on HSB's representations concerning what was reported under the expiring policy, because, as Burnhope testified, whether or not notification was given under the expiring policy was "irrelevant" to his underwriting decision.  (Burnhope Dep. 73.)                    2. Whether SVB is Entitled to Reformation to Exclude Losses from the Explosion

The Connecticut Supreme Court has cautioned that, in exercising its power to reform a contract, a court must act with the utmost caution and can only grant the relief requested if the

prayer for reformation is supported by convincing evidence.  *Greenwich Contracting Co. v. Bonwit Constr. Co.,* 156 Conn. 123, 126-27 (1968); *Palmer v. Hartford Fire Ins. Co.*, 54 Conn. 488, 500 (1887).  Moreover, reformation should not be granted "for the purpose of alleviating a hard or oppressive bargain, but rather to restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of both parties."  *Lopinto*, 185 Conn. at 532.

 I will first address SVB's claim for reformation based upon a unilateral mistake, which requires a showing of actual or constructive fraud or other inequitable conduct on the part of HSB.  Even assuming that Underwriters believed that HSB had reported everything under the expiring policy, SVB cannot carry its heavy burden of showing by clear, convincing, and substantial evidence that HSB's failure to report the explosion was fraudulent or that HSB engaged in any other conduct that could be characterized as inequitable.

In the context of reformation of a contract based on a unilateral mistake coupled with fraud, the Connecticut courts have defined "fraud" as including "not only misrepresentations known to be such, but also concealment or nondisclosure by a party who knows that the other party is acting under a mistake as to material facts."  *Baptist v. Bankers Indem. Ins. Co.,* 245 F. Supp. 33, 37 (D. Conn. 1965) (quoting *Home Owners Loan Ass'n v. Stevens*, 120 Conn. 6, 10 n.2 (1935)), *aff'd*, 377 F.2d 211 (2d Cir. 1967).

As HSB points out, although the Policy had an effective date of December 1, 2000, it was not actually issued until April 19, 2001.  The evidence is undisputed that Cooper was the only person at HSB who was involved with the procurement of the Policy and that she was not aware of the Nursing Home explosion until 2004.  There is simply no evidence to suggest that Cooper

knew her statements to be false when she provided the incidents list to Barton in November 2000 and represented that it included all incidents that could possibly give rise to a claim. Nor is there any evidence to suggest that Watkins engaged in any type of fraudulent conduct in compiling the incidents list, because her testimony is undisputed that she did not know the purpose for that list. On the other hand, the evidence is undisputed that, as of November 2000, HSB's Legal Department was aware of the Nursing Home explosion, the personal injuries and deaths resulting therefrom, and had hired outside counsel to represent the interests of HSB. SVB correctly argues that generally a corporation is charged with constructive knowledge of all material facts of which its officers and agents acquire knowledge while acting in the scope of their employment. 3 *Fletcher Cyc. Corp.* § 790 (2009 Supp.). Thus, HSB cannot dispute that it made a false statement to SVB in connection with providing the incidents list, even though no employee was aware that a false statement had been made.

A showing of fraud, however, requires more than just a false statement. There must also be an intent to defraud, of which there is absolutely no evidence in this case, circumstantially or otherwise. *See Busker v. United Illuminating Co.*, 156 Conn. 456, 458-59 (1968). HSB had no motive to leave the Nursing Home explosion off the incidents list, because including that incident on the list would not have affected coverage under the Policy, which turns on what HSB knew rather than on what it listed. Nor is there any evidence of SVB's reliance on the contents of the incidents list for, as HSB points out, Burnhope testified that it was "irrelevant" to his underwriting decision.[16] To justify reformation based upon a unilateral mistake coupled with

---

[16] SVB attempts to explain his testimony by stating that Burnhope was referring to the *contents* of the List. "Obviously, Burnhope was not saying the *provision* of a complete list to HSB's prior insurers was inconsequential to him. On the contrary, the entire deal hinged on it."

fraud, there must have been reliance on the part of the party seeking reformation – in other words, that party must have been actually misled. 66 Am. Jur. 2d, *Reformation of Instruments* § 24 (2009).  Moreover, only a mistake concerning a material fact can form the basis for reformation of a contract.  *See DeLuca v. C.W. Blakeslee & Sons, Inc.*, 174 Conn. 535, 544-45 (1978).  Here, Burnhope's testimony was unequivocal that the provision of the List and the contents of the List were irrelevant to his underwriting decision.

The Connecticut courts have repeatedly cautioned that fraud is not to be presumed and must be strictly proven by clear, convincing, and unequivocal evidence.  *See Id.*  Even when the facts are viewed in the light most favorable to SVB, there is no genuine issue of material fact whether HSB acted with fraudulent intent or whether SVB relied upon a material false statement made by HSB.  Therefore, because no reasonable jury could find facts necessary to support SVB's claim for reformation based upon a unilateral mistake supported by actual fraud, that claim fails as a matter of law.

SVB asserts that, even if fraud cannot be established, Connecticut case law makes clear that a contract may be reformed based on a unilateral mistake of fact supported by constructive fraud or inequitable conduct on the part of HSB.  SVB maintains that, regardless of what Cooper knew, HSB was charged with constructive knowledge of all material facts known to any of its

---

(Def.'s Reply Mem. 4) (emphasis in original).  A review of Burnhope's testimony, however, reveals that he testified that both the provision of the list and the contents of the list were irrelevant to his underwriting decision.  He testified that "whether or not notification was given [to the prior insurers] was irrelevant to [his] underwriting decision."  (Burnhope Dep. 73.)  In fact, he did not even recall whether he was ever told by Barton that notification had been given. *Id.*  Additionally, he testified that the information contained in the incidents report had nothing to do with his underwriting decision.  *Id.* at 80.

officers and agents, including knowledge of the Nursing Home explosion, which was known to the legal department.  Therefore, it argues, Cooper's representation, which was made on behalf of HSB, was tantamount to constructive fraud on the part of HSB.

The difficulty with this argument is that SVB erroneously equates "constructive knowledge" with "constructive fraud."  Under Connecticut law, constructive fraud requires a special or confidential relationship between the parties, the breach of which forms the basis for liability.  *See DeMorais v. Wisniowski*, 81 Conn. App. 595, 607, *cert. denied*, 268 Conn. 923 (2004); *Mitchell v. Mitchell*, 31 Conn. App. 331, 335 (1993).  The relationship between an insured and insurer has been characterized by the Connecticut courts as one based solely upon contract.  Although there may be circumstances when dealing with third-party claims that fiduciary duties arise between an insurer and its insured, such is not the case in first-party disputes between an insurer and insured.  *1049 Asylum Ltd. P'ship v. Kinney Pike Ins., Inc.*, No. CV020816344, 2003 WL 21496543, at *2 (Conn. Super. Ct. May 30, 2003).  Thus, this is not a situation where the policy may be reformed based upon unilateral mistake coupled with constructive fraud.  Similarly, there is no evidence of inequitable conduct that would allow reformation based upon a unilateral mistake.

 In the absence of fraud or inequitable conduct reformation requires proof that both parties agreed to something different from what is expressed in writing.  *Bishop*, 49 Conn. at 172. The proof on this point should be clear so as to leave no room for doubt that, through mistake common to both parties, the written contract fails to express the real agreement made by the parties.  *Harlach v. Metropolitan Prop. & Liability Ins. Co.*, 221 Conn. 185, 190 (1992).

SVB emphasizes that HSB is charged with the knowledge and understanding of Barton,

32

its agent who procured the Policy. *See McDermott,* 263 Conn. at 384-85. Charging HSB with knowledge that the Policy would not cover "known claims/circumstances," however, is far different than charging HSB with knowledge of precisely what incidents the Policy would and would not cover, including the losses arising from the Nursing Home explosion.[17] Neither Barton nor Burnhope was even aware of the explosion at the time the Policy was being negotiated. Indeed, as of the inception of the Policy, neither the wording of the Policy nor the wording of Exclusion M had been agreed upon by the parties. Burnhope had simply indicated that he wanted a "Known Claims/Circumstances Exclusion" which he described on the back of the quote sheet as "Claims and Circumstances" known to the office of the General Counsel, identified in the due diligence process, and known to any director of HSB, with the actual policy wording to be agreed upon. (Barton Dep. Ex. 2.)

In the case of *Union America Ins. Co. v. Atlas Construction Co.,* No. CV 980168418S, 2000 WL 839982, at *4 (Conn. Super. Ct. May 12, 2000), the insurance company sought reformation of an insurance policy based upon mutual mistake and unilateral mistake coupled with inequitable conduct on the part of the insured. Contrary to the expressed intentions of the parties during the procurement of the Policy, the Policy did not include an endorsement excluding completed operations from coverage. In ruling on the insurer's summary judgment motion, the court stressed the heavy burden that the party seeking reformation bears and admonished that "[t]his standard of proof should operate as a weighty caution upon the minds of

---

[17] As discussed at length below, there are genuine issues of material fact as to whether, based on the facts known to HSB on December 1, 2000, HSB should have reasonably anticipated that the Nursing Home explosion would result in Claims under the Policy. *See* Discussion at 56-60, *infra.*

all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory." *Id.* at

*4  (internal citations and quotation marks omitted).  Despite affidavits from the individuals who

negotiated the issuance of the policy for both sides that the policy would not cover completed

operations, as well as a firm quote and cover note indicating that the policy excluded all

completed operations prior to inception, the court denied the insurance company's motion for

summary judgment. The court found that, although the insurance company's evidence was

relevant to show the parties' intent to exclude completed operations from coverage under the

policy, it had failed to prove by clear and convincing evidence that it made a mistake in failing to

exclude coverage for completed operations from the policy.  *Id.* at *5.

In the instant case, the facts are far less favorable to the insurer than in *Union America*.

Although it is clear that the parties intended the Policy to exclude known "claims/

circumstances," it is not clear that an agreement had been reached about precisely what those

"claims/circumstances" would encompass.  In *Baptist v. Bankers Indemnity Insurance Co.,* 245

F. Supp. at 40, this court refused to grant reformation of an insurance contract where the plaintiff

had failed to sustain his burden of establishing the existence of the terms of the alleged

antecedent agreement with sufficient clarity.  Similarly, in this case, SVB has not proven by

clear, convincing, and substantial evidence the precise antecedent agreement between Barton and

Burnhope, other than that there would be a known "claims/circumstances" exclusion, with the

wording to be agreed upon by the parties.  Thus, there can be no mutual mistake on which to base

a claim of reformation.

SVB bears a heightened burden of proof in seeking reformation of the Policy.  *Anderson*

*v. Liberty Lobby* instructs that whether "a given factual dispute requires submission to a jury

34

must be guided by the substantive evidentiary standards that apply to the case." 477 U.S. at 255.

Applying that standard to the evidence of record, I conclude that SVB has not and cannot meet its

burden.  Accordingly, SVB is not entitled to reformation of the Policy.  SVB's motion for

summary judgment on Count I of its Counterclaim seeking reformation of the Policy to exclude

all losses arising out of the Nursing Home explosion is denied.  Conversely, after viewing the

evidence in the light most favorable to SVB, HSB's motion for summary judgment on Count I of

the Counterclaim is granted.  The Policy will not be reformed to exclude all losses arising out of

the Nursing Home explosion.

      <u>B.  Reformation of the Policy to Strike the Revisions to Exclusion M</u>

      In Count II, SVB seeks to reform the Policy by striking the amended version of Exclusion

M and leaving the original version as the operative provision.

        <u>1.  The Parties' Arguments</u>

      As with the previous count, SVB has moved for summary judgment on Count II of its

Counterclaim on the ground that the record contains clear, substantial and convincing evidence

that Underwriters' agreement to amend Exclusion M in 2002 was the result of mutual mistake

between those who negotiated the amendment or a unilateral mistake on the part of SVB induced

by HSB's failure to disclose the lawsuits that had been filed against HSB.  SVB argues that, by

the time Exclusion M was amended, Burnhope was no longer involved in the negotiations and a

new underwriter with SVB, Peters, was involved.  Four of the Lawsuits had been filed, yet

neither Peters nor Barton was aware of the explosion or that any of the Lawsuits had been filed

against HSB.  Although Cooper, who requested the revision, was also not aware of the Lawsuits

and withheld nothing from Barton or the Underwriters, SVB maintains that she was acting on

behalf of HSB in requesting this amendment and, indisputably, HSB's legal department was aware of the Lawsuits.  In sum, it argues, Underwriters' agreement to amend Exclusion M was necessarily the result of either a mutual mistake of fact between Barton and Peters or a unilateral mistake of fact by Peters that was induced by HSB's concealment of the Lawsuits.

HSB responds that SVB cannot prevail on this reformation claim for the same reasons it cannot prevail on its reformation claim in Count I – there is absolutely no evidence of reliance by SVB on a material misrepresentation by HSB.

### 2. Whether to Reform the Policy to Strike the Revisions to Exclusion M

The evidence of record establishes that, although HSB knew there would be some type of prior knowledge exclusion, it was not aware of the exact wording of Exclusion M until April 19, 2001, when first provided with a copy of the Policy for review.  Cooper, who had no knowledge of the Nursing Home explosion, testified that she sought revision of Exclusion M because it was not worded according to common industry standards and she did not feel that it "totally, accurately reflected the intent of both the underwriters and [herself], and needed a little tweaking for [their] specific business, and how incidents come in."  (Cooper Dep. 151.)   Peters, the new underwriter with SVB, agreed to the proposed changes without performing any new analysis of the risk or evaluation of how the revisions might change the coverage.  There was no new underwriting activity whatsoever.

The fact that Lawsuits had been filed against HSB did not necessarily mean that a claim would ever be filed under the Policy because the reporting threshold was $2 million and the self-insured retention was $5 million.  The evidence indicates that it was not until 2004, two years

36

after the revision to Exclusion M, that HSB became aware that the losses could rise to a level that would implicate coverage under the Policy.   As with Count I, the evidence fails to support a claim for reformation based on mutual mistake at the time Exclusion M was revised, or upon HSB engaging  in actual or constructive fraud or other inequitable conduct that would warrant reformation based on a unilateral mistake.  For the reasons as set forth above, SVB's motion for summary judgment with respect to Count II of the Counterclaim is denied as a matter of law and HSB's motion for summary judgment with respect to Count II of the Counterclaim is granted.

C.  Whether SVB Is Entitled to Declaratory Relief Based On the Known Loss, Loss in Progress, and Fortuity Doctrines

In the third, fourth and fifth counts of its Counterclaim, SVB seeks a declaration that the amended version of Exclusion M is inoperative based on the known loss, loss in progress, and fortuity doctrines. The factual premise underlying theses arguments is the same as that underlying the reformation claims with one exception.  By late 2001, when HSB first sought to amend Exclusion M, not only had it been named as a defendant in several lawsuits, but it had also begun incurring an actual "loss," in the form of defense costs.

1.  The Parties' Arguments

Citing *Travelers Property Casualty  v. H.A.R.T., Inc.*, No. CV980485730S, 2001 WL 649616, at *6 (Conn. Super. Ct. May 18, 2001), SVB argues that these doctrines, which are often used interchangeably, *see Yale Univ. v. Cigna Ins. Co.*, 224 F. Supp. 2d 402, 416 (D. Conn. 2002), bar coverage for a known risk or loss in progress.  The purpose of insurance is to protect insureds against unknown risks.  Where the loss has already occurred or is in progress, the insured should not be permitted to secure additional coverage, as it did in this case, by seeking an

amendment to Exclusion M.  HSB did not disclose the Lawsuits or its ongoing expenditure of

defense costs to SVB until long after SVB had agreed to the amendment to Exclusion M.

Therefore, SVB argues, as a matter of law, the known loss, loss in progress, and fortuity

doctrines render the amendment inoperative in this dispute.

HSB responds that, although it had incurred defense costs by the time Exclusion M was

negotiated, it had not incurred a "loss" as is contemplated by the known loss doctrine, because

there had been no determination that it had a legal obligation to pay damages to a third party in

connection with any of the Lawsuits.  *See Peck v. Public Serv. Mut. Ins. Co.*, 363 F. Supp. 2d

137, 146-47 (D. Conn. 2005).   Additionally, HSB was not aware of any facts that would support

a finding of liability against it and, thus, the fortuity doctrine does not bar coverage.  *See United*

*Technologies Corp. v. Amer. Home Assur. Co.*, 989 F. Supp. 128, 148 (D. Conn. 1997) (holding

that fortuity must be judged using a subjective standard). HSB also emphasizes that, given the $5

million self-insured retention, at the time Exclusion M was amended, it had absolutely no reason

to believe that the actual loss would exceed $5 million.  Decisions from other jurisdictions have

applied these doctrines to preclude coverage when there was a significant self-insured retention

or, in the context of excess insurance coverage, when it appeared that the insured had knowledge

that the loss would exceed the self-insured retention amount or reach the excess layer of

coverage.  *See Atchison, Topeka & Sante Fe Ry. Co. v. Stonewall Ins. Co.*, 275 Kan. 698, 756

(2003) (recognizing a difference between an insured's knowledge of risks and its knowledge of

losses, in particular losses that would exceed its self-insured retention and thus covered by the

liability policies)*; Gould, Inc. v. Arkwright Mut. Ins. Co.,* 907 F. Supp. 103, 109 (M.D. Pa. 1995)

(holding that in order for the known loss doctrine to preclude coverage under an excess insurance

policy, there must be evidence that there existed certain knowledge of a particular legal liability

which would reach the excess layer); *Wisconsin v. Hydrite Chem. Co.*, 280 Wis. 2d 647, 671-72

(Ct. App. 2005) ("[I]n order for the known loss doctrine to apply under a [comprehensive general

liability] policy, the insured must know more than the fact that there has been an occurrence that

has caused damage to the property of a third party; the insured must also know that it is

substantially probable that the insured will be liable for the damage." Additionally, when excess

polices are involved, "the insured must know there is a substantial probability" that the damages

for which the insured will be liable "will reach the excess layer."). Given Connecticut's narrow

application of the fortuity doctrine, HSB maintains that Connecticut courts would follow these

decisions.

> ## 2.  Whether the Known Risk, Loss-In-Progress, or Fortuity Doctrine Renders the Amendment to Exclusion M Inoperative

The facts of the instant case are significantly different than the facts of any of the cases

cited by either side.  None of the cited cases applied these doctrines to bar coverage where only

defense costs had been incurred; none of the cases involved a wording revision to an existing

policy where there was no new underwriting activity; and none of the cases involved an extended

reporting period policy.  Additionally, the Policy at issue contains a "prior knowledge" exclusion,

which embodies the rationale underlying these doctrines.  Although I am not aware of any

Connecticut decisions discussing whether the presence of an express policy exclusion overrides

these common-law doctrines, the Second Circuit in *National Union Fire Ins. Co. v. Stroh*

*Companies, Inc.*, 265 F.3d 97, 107 (2d Cir. 2001), applying New York law, held that the fortuity

and known loss doctrines are "integral to the nature of insurance and thus apply as a matter of

public policy, irrespective of specific policy terms." *See also Buckeye Ranch,* 134 Ohio Misc. 2d

at 24 (applying these doctrines despite an express policy exclusion). Thus, I assume these

doctrines will apply despite the existence of a policy exclusion.

This is not a case where the insured obtained reinstatement of a cancelled policy after

becoming aware of a significant loss, as in *Travelers Property Casualty v. H.A.R.T.*, relied upon

by SVB. There the insured sought retroactive reinstatement of her policy after a deadly accident,

which was knowingly concealed from the insurer. In that case, the court found that the "loss

arose from a single, instantaneous and egregious event. [The plaintiff's] knowledge of the loss

was clear and unequivocal," and was, therefore, uninsurable as a matter of law because it was a

known loss. 2001 WL 649616, at *7  Here, HSB sought a revision to the wording of an

exclusion in a policy that was already in effect at the time the Lawsuits were first filed. There

was no new underwriting analysis. In contrast to the *H.A.R.T.* case, where the insured

deliberately misrepresented the reason for seeking retroactive reinstatement of the policy, there

was no affirmative misrepresentation about why the change was being sought.

In *United Technologies Corp.,* 989 F. Supp. at 148-52, this court examined the fortuity

doctrine and the loss in progress doctrine in the context of an environmental insurance coverage

dispute and adopted a narrow interpretation of both. The court held that the determination

whether a loss was fortuitous should focus on whether the insured knew of a loss under the

policies, not whether the insured knew of the cause of the damage. *Id.* at 148. Thus, although

the insured may have known of the waste disposal practices that ultimately resulted in the

contamination, a question of fact remained whether it knew at the inception of the policy that

those practices would result in environmental contamination. *Id.* Likewise, the court narrowly

interpreted the loss in progress doctrine. Based on the weight of authority from other jurisdictions

and the Connecticut Supreme Court's strong preference for non-forfeiture of coverage, the Court

held that Connecticut would adopt the subjective approach to the loss in progress doctrine, *i.e.,*

that the doctrine applies only when the insured knew of a threat of loss so immediate that it might

fairly be said that the loss was in progress and that the insured knew it at the time the policy was

issued or applied for. *Id.* at 151.

Likewise, in *Peck v. Public Service Mutual Insurance,* 363 F. Supp. 2d at 145-46,  this

court opined that Connecticut courts would narrowly apply the known loss doctrine.  The court

declined to extend the doctrine to preclude coverage where the insured had already been named

as a defendant in a lawsuit at the time it was added to the policy, but it had not yet been found

liable nor had the amount of damages been established.  In a footnote, the court specifically

disagreed with the case law from other jurisdictions suggesting that the known loss doctrine

applied to a loss for which suit has been filed prior to the effective date of the policy.  *Id.* at 147

n.6 (citing *Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27 (1st Cir. 1981)); *see also Buckeye*

*Ranch, Inc.,* 134 Ohio Misc. 2d at 23 (holding that the "known loss" doctrine would not bar

coverage where the insured knew of an act that someday might result in damages – the sexual

assault of a young boy at its treatment facility several years before the inception of coverage – but

for which no damages were known); *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645,

691 (1995) (holding that a potentially responsible party letter from the EPA prior to the effective

date of the policy did not invoke the known loss doctrine because the insured's liability was not

certain; the fact that the insured knew that it was more probable than not that it would be sued

did not defeat coverage or a duty to defend); *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*,

73 F.3d 1178, 1214-15 (2d Cir. 1995) (rejecting the known loss doctrine as a defense where the insured was aware prior to the inception of the policy that its products caused asbestos-related diseases and that it had received a large number of claims, yet it was highly uncertain about the prospective number of injuries, the number of claims, and the amount of ultimate losses it would be called upon to pay), *modified on other grounds,* 85 F.3d 49 (2d Cir. 1996); *National Union Fire Ins.*, 265 F.3d at 106-07 (applying New York law and rejecting application of the known loss and fortuity doctrines where, prior to the effective date of the policy, the insured knew of a broken glass problem that made a recall of its beverage product likely, but the recall and expenses associated with the recall did not take place until after the policy issued).

Based upon the narrow interpretation of these doctrines in prior decisions in this District, I decline to extend their application to a case such as this where the only "loss" was defense costs and no determination of liability or damages had been made.   Additionally, I find persuasive the reasoning of the decisions cited by HSB that have declined to apply these doctrines when excess insurance was involved, unless the insured knew that there was a substantial probability that the damages for which the insured would be liable would reach the excess layer.  *Wisconsin v. Hydrite Chem. Co.*, 280 Wis. 2d at 671-72; *Gould, Inc.,* 907 F. Supp. at 109.  In this case, the Policy contained both a $2 million notice threshold and a $5 million self-insured retention limit.  Although SVB vehemently argues against importing either of these into the prior knowledge exclusion, they are relevant considerations.  Clearly, neither HSB nor SVB expected that the Policy would provide any coverage for losses under $5 million, and there was no duty to report a loss unless it appeared likely to exceed $2 million.  The evidence is undisputed that it was not until 2004 that HSB anticipated that its losses might exceed the reporting threshold and self-

insured retention limit.   Where there is no evidence that at the time Exclusion M was amended

HSB knew with substantial certainty that its liability would exceed the $5 million self-insured

retention, the known loss, loss in progress, and fortuity doctrines do not apply to render the

amendment to Exclusion M inoperative.  Accordingly, SVB's motion for summary judgment

must be denied and HSB's motion for summary judgment is granted with respect to Counts III,

IV, and V of the Counterclaim.

## II.  Whether the Amended Version of Exclusion M Bars Coverage

Because reformation of the Policy is not warranted[18] and that the amended version of

Exclusion M applies, I now turn to the central issue in this litigation: whether this exclusion bars

coverage for the Lawsuits.  The resolution of that issue, in turn, depends on the proper

construction of the language of the exclusion.  This is a matter on which SVB, as the party

denying coverage based on an exclusion in the Policy, bears the burden of proof.  *See Western*

*World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (applying Connecticut law).

### A.  The Parties' Contentions

HSB asserts that the determination whether Exclusion M applies turns on the

interpretation of the phrase: "circumstance which could reasonably be expected to give rise to a

claim," which is not defined in the Policy.  HSB asserts that the court must give that language its

"reasonable and natural interpretation," citing *Coregis Insurance Co. v. American Health*

*Foundation, Inc.*, 241 F.3d 123, 127 (2d Cir. 2001), and that the exclusion cannot be read in

isolation but must be read in the context of the entire Policy.  *See Coregis Ins. Co. v. Goldstein*,

---

[18]  Having held that the Policy should not be reformed, I deny SVB's motion for summary
judgment with respect to Count VI of its Counterclaim and grant HSB's motion addressed to that
count.

32 F. Supp. 2d 508, 512 (D. Conn. 1998); *Buell Indus., Inc. v. Greater New York Mut. Ins. Co.*, 259 Conn. 527, 539 (2005).   Moreover, it asserts that under Connecticut law this exclusion must be narrowly construed, citing *Coregis Insurance Co. v. Goldstein*, 32 F. Supp. 2d at 510, 513 (where the policy excluded coverage for "[a]ny CLAIM arising out of any act, error, omission or PERSONAL INJURY if any INSURED at the effective date *knew or reasonably could have foreseen* that such act, error, omission or PERSONAL INJURY might be expected to be the basis of a CLAIM") (emphasis supplied).

HSB argues that when the term "circumstance" is interpreted in the context of the entire Policy, it must be construed as "a wrongful act, error or omission on the part of the insured." HSB concedes that, prior to December 1, 2000, it was aware of the explosion but maintains that it was not aware of any "circumstance" that could reasonably be expected to give rise to a professional liability claim against it because, as of December 1, 2000, it was not aware of a wrongful act, error or omission on its part that caused the explosion.  Rather, its only involvement with this boiler was an inspection a year before.  HSB asserts that the mere fact that a professional service, a boiler inspection, had been rendered does not constitute a "circumstance" within the reasonable interpretation of the Policy, unless HSB had some knowledge of an error or omission in providing that service.  To hold otherwise would render every one of its 500,000 annual jurisdictional inspections allegedly connected to any property damage or personal injury a reportable "circumstance."   HSB argues that such a broad interpretation flies in the face of the overall language of the Policy.

HSB stresses that once it concluded that the explosion was not caused by a defect in the boiler that it had inspected or by the negligence of its inspector, it did not expect that a

44

professional liability claim would be made against it.  Indeed, it points out that its outside

counsel had closed his file on this matter.  The first lawsuit arising out of the Nursing Home

explosion, which alleged for the first time that HSB was negligent in its inspection of the boiler,

was not filed until 2001, after issuance of the Policy.  HSB maintains that even during discovery

its belief that its exposure was very limited was well-founded and, certainly, there was no basis

for believing that the $5 million self-insured retention under the Policy would be exhausted.

Only in 2004, when one of the plaintiffs' retained experts opined for the first time that the boiler

had been leaking for many years, setting off the chain of events that culminated in the explosion,

and when new testimony came to light that the boiler stands were part of a jurisdictional

inspection, did HSB became concerned that its potential liability could exceed the Policy's $2

million reporting threshold.  Thus, it contends that these Lawsuits are not excluded from

coverage under amended Exclusion M because, as of December 1, 2000, HSB was not aware of a

wrongful act, error or omission by HSB that could "reasonably be expected to give rise to a

Claim."  HSB asserts that no reasonable juror could find, in light of the facts known to HSB as of

December 1, 2000, that an insured in its position would foresee that those facts could give rise to

a claim.  Therefore, it maintains that it is entitled to summary judgment as a matter of law.

The fact that HSB failed to include the Nursing Home explosion on the incidents list is

irrelevant, HSB reasons, for even if had been listed, coverage would have been denied based

upon its failure to identify a specific wrongful act or omission.  Barton testified that SVB wanted

all claims and circumstances known to HSB to be "notified" under the expiring policy.  (Barton

Dep. 42-44.)  Under the expiring policy, notification required HSB to be aware of a "specific

Wrongful Act."  Prior to December 1, 2000, HSB was not aware of any wrongful act on its part

in connection with the Nursing Home explosion and, thus, even if that explosion had been on the incidents list, it would not have constituted notification under the expiring policy.  To exclude coverage for the Lawsuits under the extended reporting Policy would create a significant gap in coverage, which is precisely what HSB intended to avoid by its purchase of an extended reporting period policy for a $1 million premium.   The purpose of the Policy was to provide coverage for claims against HSB relating to conduct that occurred prior to December 1, 2000.

Finally, HSB suggests that this case does not pose the "moral hazard" that Exclusion M was designed to avoid, where an insured takes out a claims-made policy to cover past misconduct of which it is aware and which reasonably could be expected to result in a claim under the policy. *See, e.g., Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 240-41 (3d Cir. 2006) (holding that it is reasonable for an insurer to refuse coverage for claims based on pre-existing but undisclosed misconduct by the insured, but noting that this "moral hazard" does not exist if the insured is not subjectively aware that an error has occurred and has no reason to anticipate the need for professional liability insurance).  According to HSB, there is absolutely no evidence that HSB recognized a problem with the Clara Barton inspection and rushed out to purchase extending reporting coverage insurance before the error was discovered and a lawsuit was filed. Cooper, who was solely responsible for obtaining this coverage, had no knowledge of the explosion or Lawsuits until early 2004.

SVB responds that the revised version of Exclusion M bars coverage for the Lawsuits because the explosion, coupled with the accumulated facts indisputably known to HSB's law department on the Policy's inception date, constituted a "circumstance" that could reasonably be expected to give rise to a "claim" in the form of either a lawsuit (meritorious or not) or a

monetary demand on the company.  SVB asserts that the events of 2004 are entirely irrelevant.

Instead, the only events that can possibly be relevant to the issue of Exclusion M's applicability

are those that took place between November 10, 1999, the date of the explosion, and December

1, 2000, the Policy's inception date.

SVB asserts that HSB's interpretation of Exclusion M, which requires the insured to have

knowledge of an error, omission or other misconduct in the provision of professional services,

ignores the plain and ordinary meaning of "circumstance," which is "an incident" or "an

occurrence," *Oxford English Dictionary* (2d ed. 1989), or "a particular incident or occurrence,"

*American Heritage Dictionary of the English Language* (4th ed. 2000), or "the set of facts . . .

that surround a situation or event."  *Webster's (On-Line) Dictionary* (2007).[19]  SVB cites to the

email that Cooper sent to Barton who, during the underwriting process, had asked her to report

all known claims and circumstances under HSB's expiring policy.  "Our legal department has

prepared various exhibits to update Underwriters on all *incidents* which could possible [sic] give

rise to a claim." Memo dated 11/22/00 from Cooper to Barton (Burnhope Dep. Ex. 5) (Def.'s

emphasis).  Again, when her assistant faxed the reports to  Barton, she referred to them as

"incident" reports.  Memo dated 11/30/00 from Bassett to Barton (Burnhope Dep. Ex. 6).

Notably, SVB argues, the list did not identify any specific errors or omissions.

Additionally, SVB contends that Exclusion M has nothing to do with the Policy's

reporting requirement, which has a $2 million threshold.  With respect to HSB's argument that

SVB's "broad and limitless" interpretation of Exclusion M would bar coverage for virtually

_____

[19]  These dictionary references are taken directly from Defendant's Memorandum which
does not contain page numbers.  (Def.'s Opp'n Mem.10.)

everything, SVB replies that it would only bar coverage for circumstances that, on the inception date, were significant enough to have come to the attention of HSB's in-house lawyers or directors.  Thus, it focuses on whether HSB's law department, at the Policy's inception, had knowledge of a "circumstance" – that is, a set of facts surrounding a particular event or incident – that could have reasonably been expected to give rise to a claim.

With respect to the phrase, "which could reasonably be expected," SVB suggests a subjective and objective approach, citing *Colliers Lanard & Axilbund*, 458 F.3d at 233.  First the court should examine the facts known to the insured on the inception date – the subjective prong. Then the court should consider whether a reasonable professional possessed of such facts could have anticipated or foreseen that a claim might be forthcoming – the objective prong.  *Id.*

SVB emphasizes that HSB is an experienced insurance company, which was well aware that when people have been killed and injured, and when there has been extensive property damage, the "deep pocket," HSB, is going to be dragged into litigation.  SVB insists that any reasonable insurance company, such as HSB, possessed of the facts known to HSB's law department on the Policy's inception date – including not only the explosion and its devastating consequences, but also the continued testing and examinations of the boiler through 2000, the repeated requests from self-identified plaintiffs' counsel and others for HSB's inspection reports and maintenance records, St. Paul's threat to pursue HSB for full or partial reimbursement, the evidence preservation agreements, the subpoena-like documents that HSB received two weeks before the Policy incepted –  would have expected that one or more of the explosion's victims or St. Paul might sue HSB for negligent inspection or otherwise demand damages from the company.  It insists that no reasonable juror could find otherwise.  According to SVB, Exclusion

48

M does not depend on HSB's ability to assess it potential exposure, but rather depends on whether a claim, regardless of the potential liability or exposure it might present, was reasonably foreseeable based on the facts known to the HSB as of the inception date.

With respect to HSB's argument that coverage for the explosion would have been denied under its expiring policy even if it had included it on the incidents list, SVB responds that HSB should not be placed in a better position by virtue of its failing to include the explosion on the list than it would have been had it been included; clearly, that was not the intent of the drafters of the Policy. SVB emphasizes that, because the Policy was a "claims-reported" policy, where the triggering event – the reporting of a claim – was wholly within the insured's control, an exclusion such as Exclusion M was all the more significant because of the insured's ability to select when it reported a claim.

Finally, in response to HSB's argument that SVB's interpretation creates a significant gap in coverage, SVB submits that such a result cannot negate the clear language of the Policy.

In reply to SVB's argument that any reasonable insured in HSB's position should have anticipated claims against it as a result of the explosion, HSB emphasizes that, prior to December 1, 2000, its only connection to the incident at the Nursing Home was a boiler inspection the year before and no one had suggested that there was a problem with the inspection until 2004. There had been no boiler failure; the boiler had operated an entire heating season without any problem. After the explosion, the boiler remained intact and had not exploded. Testing disproved a boiler leak. Dobransky, after inspecting the boiler, had concluded that it was not the cause of the explosion and, in early 2000, the Michigan Department of Consumer and Industry Services reached the same conclusion in its investigative report. There was evidence that several

employees had smelled natural gas for a period of time prior to the explosion.  Thus, HSB argues that when one applies the proper test of "reasonable foreseeability" not "conceivability" to the facts known to it as of December 1, 2000, one must conclude that it was not reasonably foreseeable that a professional liability claim would be asserted against it.

Moreover, HSB contends that the "facts" on which SVB relies were nothing more than routine informal requests for records and information, which HSB receives on a regular basis. Not a single request implied that HSB had negligently inspected the boiler a year earlier.  The "subpoena-like" document to which SVB refers was not a subpoena and did not even identify the entity on whose behalf it was sent.  With respect SVB's argument that the explosion should have been included on the incidents list, HSB cites to the deposition of Stanhope, who testified unequivocally that the incidents list was not a condition to coverage and was irrelevant to the underwriting decision.

HSB responds that SVB views the word "circumstance" in isolation and not in the context of the entire policy or as part of a phrase "circumstance that could reasonably be expected to give rise to a claim."  When read in the context of the active phrase, HSB maintains that "circumstance" must be interpreted as referring to an error or omission or other wrongful act on the part of the insured, and not the overly broad construction urged by SVB.

B.  General Rules of Contract Construction Under Connecticut Law

 In this case, the Policy does not contain a choice-of-law provision.  Thus, because this case arises under diversity jurisdiction, I must look to the conflict-of-law rules of the forum state, Connecticut, to determine which state's substantive law will govern this dispute.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  In matters of contract interpretation,

Connecticut follows the guidelines set forth in the *Restatement (Second) of Conflicts of Laws* § 188 (1971),[20] which, in the absence of an effective choice of law by the parties, applies the law of the state with the most significant relationships to the transaction and the parties.  *See Reichhold Chems., Inc. v. Hartford Accident & Indem. Co.*, 252 Conn. 774, 780-81 (2000); *Lumbermens Mut. Cas. Co. v. Dillon Co.*, No. 98-cv-2013, 2000 WL 1336498, at *2-3 (D. Conn. Aug. 31, 2000), *aff'd*, 9 Fed. Appx. 81 (2d Cir. 2001).  Application of these factors to the facts of this case compels the conclusion that Connecticut law governs the interpretation of the Policy since HSB is headquartered in Connecticut, and the Policy was negotiated and delivered to HSB in Connecticut.  Neither side contends otherwise.

Generally, under Connecticut law, the interpretation of an insurance contract is a matter of law to be decided by the Court.  *Coregis Ins. Co. v. Goldstein*, 32 F. Supp. 2d at 512.  An insurance contract is to be interpreted using the same general rules governing the construction of any written contract and enforced in accordance with the intent of the parties, as expressed through the language of the policy.  *Imperial Cas. & Indem. Co. v. State*, 246 Conn. 313, 322 (1998); *see also Topf v. Warnaco, Inc.*, 942 F. Supp. 762, 766 (D. Conn. 1996).  "The determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy."  *Allstate Ins. Co. v. Barron*, 269 Conn. 394, 406 (2004) (internal citations and quotation marks omitted).

--------

[20]  Section 188 enumerates five factors to be taken into consideration: (1)  the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties.  *Restatement (Second) of Conflicts of Laws* § 188 (1971).

51

"If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning." *Id.* (internal citations and quotation marks omitted).   However, when the words of the policy are susceptible of two equally reasonable interpretations, the court should adopt the interpretation that will provide coverage for the loss, and should construe any ambiguities in favor of the insured.  *Id.*  This rule also applies to exclusion clauses.  *Imperial Cas. & Indem. Co.*, 246 Conn. at 325; *Yale Univ. v. Cigna Ins. Co.*, 224 F. Supp. 2d at 405-06; *Napolitano v. Coregis Ins. Co.*, No. 3:01-CV-34, 2002 WL 34159094, at *3 (D. Conn. Aug. 27, 2002), *aff'd*, 67 Fed. Appx. 74 (2d Cir. 2003).

"A court will not . . .  torture the words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings."  *Hammer v. Lumberman's Mut. Cas. Co.*, 214 Conn. 573, 584 (1990) (internal citations and quotation marks omitted).  Thus, the mere fact that the parties have advanced different interpretations of the policy terms in question does not necessitate the conclusion that the language is ambiguous.  *Smithfield Assocs., LLC v. Tolland Bank*, 86 Conn. App. 14, 19 (2004), *cert. denied*, 273 Conn. 901 (2005); *see Lee v. BSB Greenwich Mortgage Ltd. P'ship*, 267 F.3d 172, 178 (2d Cir. 2001) (applying Connecticut law). Any ambiguity in the contract must emanate from the language used rather than one party's subjective perception of its terms.  *Lee,* 267 F.3d at 178; *Elm Haven Constr. Ltd. P'ship v. Neri Constr., LLC,* No. 3:01cv1307, 2007 WL 4105330, at *18-19 (D. Conn. Nov. 16, 2007).

Additionally, when interpreting a contract, the Court must "look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every

provision in order to reach a reasonable overall result." *O'Brien v. U.S. Fid. & Guar. Co.*, 235 Conn. 837, 843 (1996); *see also R.T. Vanderbilt Co. v. Cont'l Cas. Co.*, 273 Conn. 448, 462 (2005).   No word or clause in the policy should be interpreted as mere surplusage or disregarded as inoperative, if any reasonable meaning can be given to it consistent with the rest of the policy. *A.M. Larson Co. v. Lawlor Ins. Agency*, 153 Conn. 618, 622 (1966).

It is also a basic principle of insurance law that the court should construe the terms from the perspective of a reasonable layperson in the position of the insured and not from the perspective of a sophisticated underwriter, and that ambiguities, if any, in a contract document should be resolved against the party responsible for drafting the document.  *O'Brien,* 235 Conn. at 843;  *Cmty. Action for Greater Middlesex County, Inc. v. Am. Alliance Ins. Co.,* 254 Conn. 387, 400 (2000).   Although the draftsman is usually the insurer, in this case, HSB's agent actually drafted the policy language.  Moreover, HSB is also an insurer.  Therefore, although I will construe the terms of the policy from the perspective of an insured, I will not treat HSB as a layperson or as any less sophisticated than the Underwriters.

Additionally, in construing the terms of an insurance policy, the courts have held that it is appropriate to look to the dictionary definition of a term at the time the contract was drafted to ascertain the commonly approved usage, but with the caveat that the existence of more than one dictionary definition is not the "*sine qua non*" of ambiguity.  Were that the case, few words would not be ambiguous.  *See Buell Indus., Inc.,* 259 Conn. at 539.

### C.  Interpretation of Exclusion M

 Whether policy terms are ambiguous is a question of law for the Court.  *See Imperial Cas. & Indem. Co.,* 246 Conn. at 322; *St. Paul Fire & Marine Ins. Co. v. Mo. United Sch. Ins.*

*Council*, 98 F.3d 343, 345 (8th Cir. 1996).  Ambiguity exists when there is uncertainty or indistinctness in the meaning of the language used.  *Sicaras v. City of Hartford*, 44 Conn. App. 771, 789 n.9 (1997).  As a general rule, ambiguous policy terms are generally construed in favor of the insured, but that general rule has less applicability in this case because the insured's agent was the party who drafted the language, not the insurer, and the insured is itself an insurer, not a layperson.

As originally drafted, Exclusion M referred to "any Loss in connection with any Claim or circumstance which could give rise to a Claim."  As revised, Exclusion M applied to "any Loss in connection with any Claim or circumstance which could reasonably be expected to give rise to a Claim."  Although the revision inserted the concept of reasonable expectations, that change did not affect the meaning or context of the term "circumstance."  Unfortunately, however, the term "circumstance" was not defined in the Policy.

HSB urges the Court to construe the term narrowly as referring to a wrongful act, error or omission on the part of the insured.  SVB, on the other hand, urges a broad interpretation based on the dictionary definition, an "incident" or "occurrence."  The difficulty with HSB's construction is that HSB could be acutely aware of a catastrophic event, such as an explosion, which reasonably could be expected to result in "claims" being filed against it and other "deep pockets," even though a specific wrongful act or omission on its part had not yet been identified as the cause of the explosion.  The difficulty with SVB's proposed definition is that it results in a gap in coverage and runs counter to the expectations of the insured in purchasing an extended reporting policy, although, as SVB states, this was not a renewal policy, but a run-off policy issued by a somewhat different group of Underwriters.

A "circumstance" is clearly something other than a claim, because the exclusion speaks of a "Claim <u>or</u> circumstance" (emphasis added).  The term must also be read and interpreted in the context of the entire phrase, *i.e.*, something that could reasonably be expected to give rise to a civil or criminal proceeding, an arbitration or mediation in which monetary damages are sought, or a written demand for monetary damages.  Further, when the exclusion is read in its entirety, a "circumstance" must be of sufficient significance that it was known to the Office of General Counsel, or was identified in the due diligence process performed by AIG, or was known to a member of the Board of Directors.

*Random House Webster's Unabridged Dictionary* 376 (2d ed. 2001) provides eleven different definitions for "circumstance."  The only definition that fits in the context of Exclusion M is the definition "an incident or occurrence," as urged by SVB.  None of the other dictionary definitions suggests a wrongful act, error or omission and none carries the negative connotation evoked by HSB's proposed definition.  Moreover, the term "circumstance" is commonly and ordinarily used in the broader sense of an incident or occurrence, not a wrongful act, error or omission.  I conclude that the term "circumstance" is unambiguous and, therefore, the I must give effect to the plain language of the exclusion, as read in the context of the entire policy.[21]

HSB argues that, because the Policy covered claims against HSB arising out of errors and

---

[21]   Even if I were to consider the testimony of the parties who negotiated and  drafted the Policy concerning their intent, the result would be no different.  The testimony of record indicates that in 2000 Burnhope, Barton, and Cooper understood "circumstance" to mean something akin to "incidents."  (Burnhope Dep. 53; Barton Dep. 42; Cooper Dep. 67.)  Indeed, in response to Barton's request that Cooper provide him with a list of all known "Claims and circumstances," Cooper sent an email that the legal department was preparing various exhibits to update Underwriters on all "incidents."   And, once those lists were prepared, her assistant referred to them as "incident lists."

omissions in the provision of professional services, the only relevant "circumstance" would be one indicating a breach of a professional duty.  That argument, however, has been rejected by a number of courts.  For example, in *Westport Insurance Corp. v. Atchley, Russell, Waldrop & Hlavinka, LLP,* 267 F. Supp. 2d 601, 606-07 (E.D. Tex. 2003), the court held that it did not matter whether the insured had actually breached a duty, or whether he had breached a duty but had no knowledge of it, or whether the insured knew that he had breached a duty.  Instead, all that matters in determining whether a claim is excluded under the prior-knowledge exclusion due to subjective knowledge is whether the insured subjectively knew, prior to the policy period, that his client intended to bring a claim.  *Id.* at 607; *see also Westport Ins. Corp. v. Cotten Schmidt, LLP*, 605 F. Supp. 2d 796, 806-07 (N.D. Tex. 2009).

I have found no Connecticut case law in which any court has interpreted similar language in an insurance policy.  Although there are several cases interpreting the words "error or omission" in similar exclusions, *see, e.g., Coregis Ins. Co. v. Goldstein*, 32 F. Supp. 2d 508 (D. Conn. 1998), none has addressed use of the word "circumstance."   In *Westport Insurance Corp. v. Lilley*, 292 F. Supp. 2d 165, 171 (D. Me. 2003), the court held that the following exclusion in a claims-made professional liability policy was unambiguous:

> The policy shall not apply to any claim based upon, arising out of,
> attributable to, or directly or indirectly resulting from . . . . any act,
> error, omission [or] circumstance . . . occurring prior to the
> effective date of this policy if any insured at the effective date
> knew or could have reasonably foreseen that such act, error,
> omission [or] circumstance . . . might be the basis of a claim.

Citing cases from several other district courts,[22] the court noted that other courts had generally

---

[22]  *Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka, LLP*, 267 F. Supp. 2d at 607; *Ehrgood v. Coregis Ins. Co.*, 59 F. Supp. 2d 438, 443 (M.D. Pa. 1998); *Coregis Ins. Co. v.*

viewed this language as unambiguous as well. *Id.*; *see also Westport Ins. Corp. v. Cotten Schmidt, LLP,* 605 F. Supp. 2d at 805-06 (finding a similar provision to be unambiguous).

This court has previously rejected a "continuous coverage" theory advanced by an insured in an effort to excuse the insured's failure to comply with the notice provisions in a claims-made policy. *Napolitano,* 2002 WL 34159094, at *4 (noting that the overwhelming majority of courts to have considered the issue have rejected the "continuous coverage" theory as an excuse for an insured's failure to comply with the claims-made policy terms). Additionally, as SVB points out, Exclusion M does not bar coverage for <u>all</u> circumstances that, on the inception date, could reasonably have been expected to give rise to a claim; rather it bars coverage only for such circumstances that, on the inception date, were known to HSB's in-house lawyers or directors. Thus, only if a circumstance had been brought to the attention of those at the highest levels in the company prior to December 1, 2000, would the Policy exclude coverage for a Claim arising out of that circumstance.

Although this interpretation of Exclusion M may create gaps in coverage, contrary to the intent of the insured, I cannot rewrite the Policy. *See Moore v. Cont'l Cas. Co.,* 252 Conn. 405, 414 (2000); *Hammer*, 252 Conn. at 590. Had HSB intended Exclusion M to apply only to a wrongful act, or error or omission, it could have so provided; it did not. Even when HSB suggested a revision to the original version of Exclusion M, it did not change the word "circumstance." I conclude that, in the context of Exclusion M, the word "circumstance" must

---

*Wheeler*, 24 F. Supp. 2d 475, 478 (E.D. Pa. 1998); *Coregis Ins. Co. v. McCollum*, 961 F. Supp. 1572, 1579 (M.D. Fla. 1997); *Coregis Ins. Co. v. Camico Mut. Ins. Co.*, 959 F. Supp. 1213, 1221 (C.D. Cal. 1997); *Mirachi v. Westport Ins. Corp.*, No. CIV. A. 99-4331, 2003 WL 1918975, at *3 (E.D. Pa. Apr. 21, 2003).

be interpreted to mean an "incident or occurrence."

    D.  Application of Exclusion M to the Facts of this Case

       Having determined the proper interpretation of Exclusion M, I now turn to the ultimate

issue whether Exclusion M bars coverage for the Lawsuits.  In *Colliers Lanard & Axilbund,* 458

F.3d at 233, 237,[23] the Third Circuit, applying New Jersey law, held that the plain language of a

prior knowledge exclusion mandated application of a two-part, subjective-objective test: first,

whether the insured had actual knowledge of a "suit, act, error or omission,"[24] a subjective

inquiry; and second, whether a reasonable professional in the insured's position might expect a

claim or suit to result, an objective inquiry.  Likewise, the court in *City of Brentwood v.*

*Northland Insurance Co.*, 397 F. Supp. 2d 1143, 1148 (E.D. Mo. 2005), held that a prior

knowledge exclusion required the court "to first look at the insured's subjective knowledge 'and

then the *objective* understanding of a reasonable attorney with that knowledge.'" (quoting

*Coregis Ins. Co. v. Baratta & Fenerty, Ltd.*, 264 F.3d 302, 306 (3d Cir. 2001)) (emphasis in

original); *see also Am. Special Risk Mgmt. Corp. v. Cahow*, 286 Kan. 1134, 1151-54 (2008)

(discussing the subjective, objective, and the two-prong subjective-objective tests applied by

various courts to prior knowledge exclusions, and adopting the two-prong test); *Coregis Ins. Co.*

---

    [23] HSB cites this case for the proposition that it must have been "subjectively aware of a *relevant* act, error, or omission - *i.e.*, an act by the insured that could give rise to liability."  (Pl.'s Mem. in Support of Mot. for Summ. J. 26.)  The prior knowledge exclusion in that case, however, referenced "any suit, or any act or error or omission."  *Colliers Lanard & Axilbund*, 458 F.3d at 233.  It did not include the term "circumstance," as does Exclusion M.

    [24] The policy at issue was also a claims-made professional liability policy.  The policy provided retroactive coverage for claims, "provided that the insured had no knowledge of any suit, or any act or error or omission, which might reasonably be expected to result in a claim or suit as of the date of signing the application for this insurance." *Id.* at 233.

*v. City of Harrisburg*, No. Civ. A. 1:03-CV-920, 2005 WL 2179734, at *7 (M.D. Pa. Sept. 9,

2005) (applying a two-part analysis to a prior knowledge exclusion in a professional liability

policy); *Home Ins. Co. v. Powell*, No. CIV.A. 95-6305, 1996 WL 269496, at *4 (E.D. Pa. May

20, 1996) (applying a subjective-objective test to a prior knowledge exclusion), *aff'd*, 156 F.3d

1224 (3d Cir. 1998).

Although not labeled as such, this court has analyzed prior knowledge exclusions in

claims-made policies using a two-part subjective-objective test.  *Coregis Insurance Co. v.

Goldstein*, 32 F. Supp. 2d at 512-13, involved a prior knowledge exclusion in a claims-made

professional liability policy issued to a law firm.  The court first looked at what the insured knew

as of the effective date of the policy, and then considered whether the insured, an attorney, could

have reasonably foreseen that his acts, errors and/or omissions might be expected to be the basis

of a claim.  The court concluded that a reasonable fact finder could find that an attorney would

not have reasonably foreseen that a claim might be expected and denied summary judgment on

that basis.  Likewise, in *Napolitano,* 2002 WL 34159094, at *3, this court looked at the facts

known to the insured attorney as of the effective date of the policy and then applied an objective

test to determine whether a  "reasonable attorney" could have foreseen that a malpractice action

would be filed.   Citing *Home Insurance Co. v. Powell*, 1996 WL 269469, at *5 n.5, the court

noted that it mattered not that the insured did not believe the claim had merit.  *Napolitano,* 2002

WL 34159094, at *3.  Accordingly, I will apply the accepted two-part analysis to the facts of this

case.

There is no question that as of December 1, 2000, HSB's legal department knew of the

Nursing Home explosion, which would constitute an event or incident that could give rise to a

claim.  Thus, the first subjective prong of the Exclusion is satisfied.

The objective prong, however, is more troublesome.  As of December 1, 2000, would a professional in the position of HSB have reasonably expected a claim to be made against it in connection with the Nursing Home explosion?  Both sides maintain that there is no genuine issue of material fact in this regard.  HSB argues that a reasonable insured in its position possessing the facts known to it as of December 1, 2000, would not have reasonably anticipated that a claim would be filed against it.  Not surprisingly, SVB insists that a reasonable insured in HSB's position (particularly given that HSB was also an insurer) would have expected the explosion to give rise to a claim.

Looking at the facts as of December 1, 2000, HSB's only involvement with the Nursing Home's boiler had been a jurisdictional inspection the year before the explosion – one of approximately 500,000 such inspections performed every year.  The boiler had functioned thereafter for nearly a year without incident.  After the explosion, the boiler was intact. Witnesses had reported smelling natural gas prior to the explosion, which would indicate a natural gas leak, rather than a steam or water pressure explosion.  The design of the boiler with a pressure release valve made an explosion unlikely.  The Michigan Department of Consumer and Industry Services had issued an investigation report, concluding that the hot water heat boiler pressure boundary had not ruptured in the explosion, and immediately thereafter two local newspapers wrote articles stating that the boiler was not at fault.   HSB had denied coverage under its Equipment Breakdown Policy, which did not pay for loss of damages resulting from a combustion explosion.  HSB's outside counsel had sent it a final statement for his services and stated that every indication pointed to a natural gas explosion and that it seemed unlikely that

HSB would be named as a defendant in any future lawsuits.  And, in fact, no lawsuits had been filed against HSB.

On the other hand, as SVB points out, the explosion was a catastrophic event that resulted in massive property damage, five deaths, and extensive personal injuries.  Prior to December 1, 2000, HSB had hired outside counsel and retained an expert.  The Nursing Home had filed a claim under its Equipment Breakdown Policy.  HSB had received requests from plaintiffs' lawyers and others for its inspection reports.  St. Paul had threatened to pursue HSB for full or partial reimbursement.  Various parties had entered into an evidence preservation agreement, and the boiler was part of the evidence being preserved, tested, and inspected.

When the evidence is viewed in the light most favorable to the non-moving party on each of the cross motions on summary judgment, a genuine issue of material fact exists concerning whether a professional in the position of HSB as of December 1, 2000, would reasonably foresee that a claim could be made against it as a result of the Nursing Home explosion.  Thus, summary judgment is denied to both parties to the extent that they have sought summary judgment on the question whether Exclusion M applied to bar coverage for HSB's claims for reimbursement of the settlements paid and defense costs incurred in connection with the Lawsuits filed as a result of the Nursing Home explosion, i.e., on Count I of the Complaint and Count VII of the Counterclaims.

## III.   HSB's Alleged Breach of Its Duty to Cooperate

The last count of SVB's Counterclaim alleges that HSB breached its contractual duty to cooperate, thus releasing SVB from its obligations under the Policy.  SVB cites to the September 24, 2004 letter from Watkins and its need to file a motion to compel in this litigation.  SVB

concedes that HSB eventually produced all of the requested documents, but SVB maintains that

the production did not cure the prejudice to SVB with respect to HSB's claim for prejudgment

interest.  HSB has moved for summary judgment on that count.  SVB contends that the facts

relevant to this claim – the extent of HSB's non-compliance with SVB's requests for information

necessary for its coverage determination – remain in dispute.

Initially, I note that the Policy does not contain a cooperation clause, such as those

typically found in liability policies.  *See* Allan D. Windt, 1 *Insurance Claims & Disputes 5th* §

3.2 (2009).  The reason for this omission may be that under the Policy, the insured, HSB, was

responsible for providing its own defense and Underwriters owed no duty to defend.  (Policy §

V.B.)  Nevertheless, at least one Connecticut court has recognized an implied duty of cooperation

owed by an insured to an insurer under the common law.  *SEACO Ins. Co. v. Hyde*, No.

X03CV010516170, 2003 WL 21152955, at *1 (Conn. Super. Ct. May 5, 2003); *see also*

*Williams v. Allstate Ins. Co.,* 595 F. Supp. 2d 532, 543 n.11 (E.D. Pa. 2009) (recognizing a

common-law duty to cooperate inherent in insurance contracts).  Even in cases involving express

cooperation clauses, however, the Connecticut courts have uniformly required that an insured's

lack of cooperation must be "substantial or material" in order to relieve an insurer of its

obligations under the policy.  *See O'Leary v. Lumbermen's Mut. Cas. Co.*, 178 Conn. 32, 38

(1979); *Curran v. Conn. Indem. Co.*, 127 Conn. 692, 696 (1941); *SEACO Ins. Co.,* 2003 WL

21152955, at *3.  "The reason why immaterial and unsubstantial failures of an assured do not

constitute a breach is because they are not included within the fair intendment of the requirement

that the assured co-operate, and lack of prejudice to the insurer from such failure is a test which

usually determines that a failure is of that nature." *Curran*, 127 Conn. at 696.  In the context of

an insured seeking coverage for its own loss (as opposed to an insured seeking coverage for a third-party claim asserted against it), the issue is not whether the insurer has been prejudiced in its defense of a third-party claim but whether the insurer has been prejudiced in its ability to complete a reasonable investigation of the insured's claim.  1 *Insurance Claims & Disputes* § 3.2.

I have found no case law supporting SVB's contention that a failure to comply with a discovery request, which necessitated the filing of a motion to compel, constitutes a breach of the duty to cooperate.  SVB concedes that all requested documents have been produced, albeit somewhat belatedly.  SVB has demonstrated no prejudice as a result of its delay in receiving those documents.  I conclude that any breach of the duty to cooperate, if in fact there was a breach, was immaterial and insubstantial and provides no grounds for relieving SVB of its obligations under the Policy.  Accordingly, HSB's motion for summary judgment with respect to Count VIII of the Counterclaim is granted.

<u>Conclusion</u>

For the reasons set forth above, the cross-motions for summary judgment addressing the claims asserted by Plaintiff in its Second Amended Complaint for breach of contract and declaratory relief are denied.  The Plaintiff's motion for summary judgment with respect to Counts I through VI and VIII of the Counterclaim are granted; Plaintiff's motion with respect to Count VII of the Counterclaim is denied.  Defendant's cross-motion for summary judgment with respect to Counts I through VII of their Counterclaim is denied.  Plaintiff's request for attorney's fees, set forth in Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment at section G is denied without prejudice to reconsideration after the trial of this action.

SO ORDERED, this 30th day of September 2009, at Bridgeport, Connecticut.


/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge