# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

HARTFORD STEAM BOILER
GROUP, INC.,
     Plaintiff,

    v.

SVB UNDERWRITING, LTD.,
     Defendant.

No. 3:04cv2127 (SRU)

## MEMORANDUM OF DECISION

This case is an insurance coverage dispute arising from an explosion that originated in the

boiler room of the Clara Barton Convalescent Center ("Clara Barton") in Flint, Michigan, on

November 10, 1999.[1]  The explosion significantly damaged Clara Barton, killed five people, and

injured many others.  The explosion was caused by a natural gas leak, but the cause of the leak

was never determined.

Hartford Steam Boiler Group, Inc. ("HSB"), the plaintiff, is an equipment breakdown

insurer that also inspects boilers.[2]  After the Clara Barton explosion, numerous wrongful death

and personal injury lawsuits were filed in Michigan state courts, including seventeen suits

alleging, *inter alia*, negligence by HSB in its inspection of the boiler, and one subrogation suit by

Clara Barton's property and casualty insurer against HSB.  In 2004, HSB settled the personal

injury and wrongful death suits for $7.35 million.  Two years later, HSB resolved the

subrogation suit through arbitration for $1.3 million.  HSB also spent $2.2 million in defense

costs.

---

[1] The plaintiff is a corporation with its primary place of business in Connecticut, and the defendant is a corporation
with its primary place of business in England.  Accordingly, in light of the significant sums at issue, the court has
diversity jurisdiction over this claim pursuant to 28 U.S.C. § 1332.

[2] Throughout this opinion, "boiler" and "pressure vessel" will be used interchangeably.

In 2000, HSB took out an insurance policy with certain underwriters, including the defendant, SVB Underwriting, Ltd. ("SVB").[3] That policy provided HSB with errors and omissions ("E&O") insurance coverage, including defense costs. "Exception M" to the policy excluded coverage for claims, or circumstances that could reasonably be expected to give rise to claims, known to the office of general counsel as of December 1, 2000. SVB argued that this exception covered the explosion at Clara Barton, which was not reported to SVB before the policy was issued. HSB disagreed, and argued that it should be able to recover from SVB for the settlements of the underlying suits as well as for litigation and arbitration costs sustained as a result of the litigation concerning the Clara Barton explosion.

A bench trial began on January 10, 2011 and ended on January 11, 2011. My findings of fact and conclusions of law are set forth below.

## I. Background

### A. Undisputed Facts

HSB is one of the largest equipment and machinery insurers in the United States. HSB specializes in equipment breakdown policies; because property and casualty insurance policies generally preclude coverage for equipment breakdowns, HSB's insurance is often used to supplement those policies. HSB also conducts boiler certification inspections of insured equipment in accordance with applicable state and city codes. Those inspections are commonly referred to as "jurisdictional inspections." HSB performs approximately 500,000 jurisdictional inspections per year.

On November 10, 1999, an explosion occurred inside the boiler room at Clara Barton, destroying a substantial portion of the building, killing five people, and injuring numerous

---

[3] Although SVB is now known as Novae Underwriting, Ltd., it will be referred to as SVB throughout this decision.

others.  Clara Barton had purchased an insurance policy from HSB, and if the damage had been

caused by a boiler explosion, HSB would have had to reimburse Clara Barton for the property

damage and lost income that resulted from the explosion.  In connection with its equipment

breakdown policy, HSB had also conducted periodic jurisdictional inspections of the heating

boiler inside Clara Barton.[4]  The last such inspection was conducted by Herbert Wathan, an HSB

employee, on November 24, 1998.  Officials ultimately determined that the explosion was

caused by the ignition of unconsumed natural gas.  The source of the natural gas is still

undetermined.

From the late 1980s through December 1, 2000, HSB maintained

"claims-made"[5] E&O professional liability insurance through the Lloyd's of London insurance

market to cover, among other things, potential risks arising from or relating to its jurisdictional

inspection activities.  In 2000, HSB opted to purchase extended reporting period coverage, also

referred to as "tail" or "run-off" coverage.[6]  The purpose of the extended reporting period

insurance was to cover claims that would have been covered under the regular claims-made E&O

policy, but which came to light after the end of the policy term.  Certain underwriters issued the

run-off policy to HSB for the period December 1, 2000, through December 1, 2005.  The run-off

---

[4] In addition to the heating boiler, there were two hot water boilers at Clara Barton that were insured by HSB.  The heating boiler, however, is the only boiler at issue in this case, and all references to "the boiler" refer to it.

[5] The Connecticut Insurance Department Regulations define a "claims-made policy" as:

> [A]n insurance policy . . . that covers liability for injury or damage that the insured is legally obligated to pay (including injury or damage occurring prior to the effective date of the policy, but subsequent to the retroactive date, if any), arising out of incidents, acts or omissions, as long as the claim is first made during the policy period or any extended reporting period.

Conn. Agencies Regs. § 38a-327-1(a) (2010).

[6] Tail coverage is generally purchased from the expiring claims-made insurer and is intended to allow a policy-holder to report third-party claims that arise after the claims-made policy expires.  *See ITC Invs., Inc. v. Emp'rs Reinsurance Corp.*, No. CV 98115127, 2000 WL 1996233, at **15-16 (Conn. Super. Ct. Dec. 11, 2000).

policy provided HSB with $35 million in E&O insurance coverage, inclusive of defense costs, in excess of HSB's self-insured retention amount of $5 million. SVB is a member of Syndicate 1241, the lead syndicate underwriting the policy.[7] That run-off policy is the policy at issue in this case.

The policy contained an Exclusion M, which stated that the underwriters would not be liable for loss in connection with any claim or any circumstance that could reasonably be expected to give rise to a claim:

"1. known to the office of General Counsel, or

2. identified in the due diligence process performed as part of the acquisition by American International Group and known to HSB Group, Inc., or

3. known to any member of the Board of Directors of the Insured or the Insured's principal operating subsidiaries

as at inception hereof, 1st December 2000."

Although HSB notified SVB of various incidents that could be expected to give rise to claims, the Clara Barton explosion was not among them.

As a result of the Clara Barton explosion, between March 2001 and July 2002, seventeen plaintiffs filed wrongful death or personal injury lawsuits against HSB alleging negligent inspection of the boiler ("the individuals' lawsuits"). In September 2004, HSB settled the suits for $7.35 million. In November 2002, St. Paul, a property insurance provider, brought a subrogation action against HSB ("the subrogation lawsuit"). HSB and St. Paul later agreed to

---

[7] For purposes of this litigation, the parties have stipulated that any judgment or verdict against SVB shall be binding upon and have the same force and effect with respect to all underwriters at Lloyd's who severally subscribed to the policy, but only to the extent of each underwriter's several share of its syndicate's proportion of any loss payable under the policy. Any judgment or verdict in favor of SVB shall be binding upon HSB as if such judgment or verdict were in favor of all underwriters in question.

arbitrate their dispute, and the matter was eventually resolved for a $1.3 million payment by HSB to St. Paul.

In December 2004, HSB brought suit against SVB in the District of Connecticut, seeking its settlement and arbitration costs, as well as other litigation expenses, as covered losses under the policy.

B.  The Summary Judgment Ruling

1.  *Disposal of Counterclaims*

In April 2007, HSB and SVB filed cross-motions for summary judgment, which I granted in part and denied in part.  Both parties sought summary judgment on SVB's contention that the insurance policy should be reformed to exclude coverage for all losses, including defense costs, that HSB incurred in connection with all claims arising out of the Clara Barton explosion, including but not limited to the lawsuits.  SVB argued it had intended for HSB to report to SVB any incidents that could possibly give rise to a claim, and any incidents that had occurred but were not reported as of December 1, 2000 were to be excluded from the policy.  Def.'s Mem. in Supp. of Mot. Summ. J. at 20.  According to SVB, any failure to make that intention clear in Exclusion M was either a mutual or unilateral mistake, and grounds for reformation of the contract.  SVB, however, failed to carry its heavy burden of demonstrating either a unilateral or a mutual mistake.  I granted HSB's motion for summary judgment on the matter, and dismissed all counterclaims seeking reformation.

At summary judgment SVB also sought to strike the final version of Exclusion M and substitute the original version, which denied coverage for claims or circumstances that could give rise to a claim:

"1. known to the office of General Counsel, or

2. identified in the due diligence process and known to HSB Group, Inc., or

3. known to any director of the Insureds or the Insured['s] principal operating Subsidiaries

as at inception hereof, 1st December 2000."

The most notable difference between the two versions of Exclusion M is that the final version applies to circumstances that *could be expected* to give rise to a claim, while the original version applied to circumstances that *could* give rise to a claim. I granted summary judgment for HSB with respect to that counterclaim.[8] SVB's only remaining counterclaim is counterclaim seven, which seeks a declaratory judgment that Exclusion M excludes coverage for all costs arising out of the Clara Barton lawsuits.

      2. *Interpretation of Exclusion M*

I laid out in the summary judgment decision how Exclusion M should be interpreted. I held that "circumstance" means "an incident or occurrence," as opposed to "a wrongful act, error or omission on the part of the insured," as HSB had argued. I also noted that the party denying coverage based on an exclusion in the Policy bears the burden of proof on that issue. *See Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (applying Connecticut law). Therefore, SVB bears the burden to prove that Exclusion M applies in this case.

Finally, I held that a two-part analysis would govern the applicability of Exclusion M. First, SVB must show what the relevant actors knew as of the effective date of the policy

---

[8] I also dismissed SVB's counterclaims that it was entitled to declaratory relief based on the known loss, loss in progress, and fortuity doctrines, and SVB's counterclaim alleging that HSB had breached its duty to cooperate.

(December 1, 2000).[9]  Second, SVB must show that a professional in the position of HSB would have reasonably expected a claim to be made against it in connection with the Clara Barton explosion.  With this roadmap in hand, we now turn to the evidence produced at trial.

## II.    Discussion

### A.    Matters Known to the Office of the General Counsel[10]

Exclusion M bars coverage for claims and circumstances: (1) known to HSB's office of the general counsel, (2) identified in the due diligence process performed as part of the acquisition by American International Group and known to HSB Group, Inc., and (3) facts known to any member of HSB's board of directors, or the board of directors of HSB's principal operating subsidiaries.  Because SVB did not produce evidence relating to the latter two categories, the applicability of Exclusion M turns on what was known to HSB's office of general counsel as of December 1, 2000.

HSB's primary witness on this matter was Stephanie Watkins, an attorney who, at the time of the explosion, worked in HSB's in-house legal department with Thomas Mochnick, then HSB's vice president and litigation counsel.[11]  Mochnick and Watkins were the two lawyers in the department primarily responsible for handling litigation and claims, and were the HSB lawyers who dealt with the Clara Barton incident.

---

[9] The purpose of Exclusion M was to limit insurance coverage to unknown risks.  Lawsuits that HSB's legal department expected to be filed would not be covered.

[10] Because the exclusion applies to claims or circumstances known to HSB as of December 1, 2000, unless otherwise noted this section describes facts only as they existed up to December 1, 2000.

[11] HSB's law department is synonymous with the general counsel's office.  Throughout this opinion those terms shall be used interchangeably.

Watkins has been employed by HSB since 1996, and considers herself to be relatively knowledgeable about the boiler industry. She has personally attended boiler inspections, site visits, and engineering tests of steam boilers.

    1.  *Initial Investigation*

On or about November 10, 1999, HSB was informed of the explosion at Clara Barton. At first, HSB employees were led to believe that there had been a steam boiler explosion. *See* ex. G (property loss notice from Voss Insurance Services, Clara Barton's insurance agency, dated November 11, 1999, describing incident as "steam boiler explosion, building destroyed, several people dead, others missing"). On November 11, 1999, the day after the explosion, HSB retained outside counsel, Dennis Withers, to represent its interests.[12] Withers had frequently represented HSB in past explosion and negligent inspection cases. HSB believed him to be quite well-informed about boiler laws and the required scope of boiler inspections. Withers was instructed to determine: (1) if Clara Barton had a current insurance policy with HSB; (2) what coverage, if any, HSB owed to Clara Barton; and (3) whether a negligent inspection lawsuit might arise against HSB. Around that time, HSB, through Withers, retained an expert, George Theus, to determine the cause of the Clara Barton explosion. In addition to Withers and Theus, Dennis Dobransky, a field adjustor for HSB, also visited the site of the explosion on several occasions.[13]

---

[12] Withers was not an employee of HSB, and therefore his knowledge prior to December 1, 2000, is only relevant insofar as he reported known facts to members of the general counsel's office.

[13] Dobransky's job entailed: investigating claims; reporting what happened; determining if there had been a covered loss; reaching settlement with the insured; and, if there was no covered loss, issuing a denial.

One of Withers' first investigatory acts was to interview Wathan, who inspected the Clara Barton boiler on November 24, 1998.[14]  That was the last time before the explosion any HSB employee inspected the boiler.  Wathan's inspection report, which Watkins saw, stated that the Clara Barton boiler had passed its inspection, and that no boiler leaks were detected.  Ex. 142.  Wathan did note that the pressure-temperature gauge was not working properly, *id*., but as far as HSB knew as of December 1, 2000, nothing relating to the pressure-temperature gauge had anything to do with the Clara Barton explosion.  At no point prior to December 1, 2000, did anyone suggest to HSB's law department that Wathan had been negligent in his boiler inspection.

In the course of their initial investigation, Withers, Theus, and Dobransky all concluded that, contrary to initial media reports, the Clara Barton boiler had not exploded, and was not the cause of the damage.  *See, e.g.,* ex. 59 (email from Theus, dated November 16, 1999, stating, "yesterday the indications were that the suspected cause of the explosion appears to be a gas leak external to the facility.  The gas pipes and other equipment appear to be corroded.  The boilers, what can be seen of them, appear to be pretty much intact."); ex. 133 (emailed report from Robert Oshnock, HSB inspector, to Dobransky, dated November 16, 1999, stating that the Michigan state inspector reported the boiler was virtually intact; the report was part of the law department's file on Clara Barton as of December 1, 2000); ex. 500 at 17-18 (deposition of Dobransky stating that, on his site visit, "I started looking the best I could to see if I could see the boiler, because the news media was reporting a boiler explosion, and ultimately we found that it was not the boiler that exploded, but it was a gas explosion."); ex. 25 (phone message from

---

[14] The evidence produced at trial indicates that the only part of the boiler that was insured or inspected by HSB was the pressurized vessel itself, not anything attached to the pressurized vessel.

Withers to Dobranksy, dated November 30, 1999, stating Withers' opinion that the investigation was centered around a gas pipe, external to the boiler, that was found to be corroded); ex. 27 (letter from Withers to Nancy Onken, head of claims department at HSB, dated March 15, 2000, concluding, "[e]very indication is that the subject explosion was caused by natural gas that entered the building in ways unrelated to the three boilers that were in the basement of this facility"); ex. 28 (letter from Withers to Watkins, dated April 25, 2000, stating, "[e]very indication we have indicates that this was a natural gas explosion which did not rupture the pressure retaining portions of either of the two boilers HSB insured at this location. Assuming that this is accurate it seems unlikely that HSB would be named as a defendant in any future lawsuits.").

When a boiler explodes, it completely shatters; the boiler at Clara Barton, on the other hand, was completely intact following the explosion, although the sheeting around the boiler suffered some debris damage. Aside from the initial reports, as the Clara Barton investigation continued, no one investigating the blast, whether employed by HSB or by others, contended that the blast at Clara Barton was the result of a steam boiler explosion.[15] Instead, a consensus emerged that the explosion was caused by the ignition of unconsumed natural gas from an undetermined source.

On January 12, 2000, an article appeared in the Flint Journal entitled "Boilers Ruled Out in Blast." Ex. 146. The article stated that, according to an investigation performed by the

---

[15] Throughout the beginning of the investigation, the media still continued to represent that the boiler may have been involved in the explosion. *See* ex. 61 (newspaper article dated November 20, 1999, that was sent to Dobransky, and which said that "investigators are also looking at equipment in the nursing home including three boilers, three gas dryers, a stove, and a chiller unit. The dryers and stove appear basically intact, but the boilers were severely damaged in the explosion.").

Michigan Department of Consumer and Industry Services ("MDCIS"),[16] a boiler had not been the cause of the Clara Barton explosion. *Id.* The article also quoted Jeff Meyers, an attorney representing victims of the explosion, as stating that the explosion was either caused by a failure of the gas piping in the building, or a failure of a gas appliance. *Id.* Watkins saw the article in question prior to or around December 1, 2000. At no time after January 12, 2000, and before December 1, 2000, did any victim or attorney inform HSB that they disagreed with MDCIS's and Meyers' assessments.

2. *LaBelle Theory*

After the explosion, Kenneth LaBelle, an employee of the City of Flint Department of Public Works and Utilities,[17] theorized that the gas buildup at Clara Barton may have come from an extinguished pilot light on the heating boiler. His theory, which he conveyed to Dobransky, was that maintenance personnel working in the basement of Clara Barton on the day of the explosion accidentally sprayed water on the boiler pilot lights, extinguishing them. *See* ex. N. He speculated that this event caused gas to build up, which eventually ignited, causing a small initial explosion inside the outer covering of the unit, perhaps in the furnace chamber.[18] LaBelle had observed a "burn" area within the combustion chamber of the boiler unit, which supported his theory.[19] After the first explosion, the boiler stand collapsed,[20] which broke the gas main

---

[16] MDCIS is the state division responsible for boiler inspections and investigations in Michigan.

[17] LaBelle was also a former HSB employee.

[18] It appears to be uncontroverted that Clara Barton experienced two explosions, the first smaller than the second.

[19] According to Withers, no one besides LaBelle took the position that there was a burn area inside the combustion chamber of the unit that could not be explained by another ignition source.

[20] LaBelle noted that someone had placed sand under the boiler, which he theorized could have allowed moisture to corrode the boiler legs. On November 30, 1999, Dave Pranulis, an executive claims official with HSB, stated in a

going to the boiler.  When the boiler cycled again, that could have ignited the gas from the broken gas main and caused the second explosion, which was the source of the significant damage.

Dobransky noted in a memorandum, which Withers received, that the boiler appeared to be slanted, and there were possible foundation problems.  But Dobransky believed that the boiler was tilted because the weight of the debris, post-explosion, caused the boiler to shift off of its foundation.  He does not agree that there was a small explosion inside the unit's skin, and believes the sheet metal skin became detached after debris from the explosion fell on it.

Withers also did not believe that LaBelle's theory was viable.  He testified that when a pilot light goes out, the gas is supposed to be cut off by an apparatus called the fire eye.  Thus, in order for LaBelle's theory to have been correct, the fire eye would have to have malfunctioned. It was also Withers' understanding at all relevant times that the boiler stand was not part of the Michigan state certificate boiler inspection, so HSB could not be liable for any damage resulting from a stand collapse.[21]  Most problematically for SVB, there is no evidence that HSB's general counsel's office knew or should have known (1) that the stand was part of a Michigan jurisdictional boiler inspection, (2) that Wathan's inspection had been negligent, or even (3) of the existence of LaBelle's theory.

3.   *The St. Paul Letter*

---

phone message to Dobransky that Pranulis had spoken with a city inspector who thought the boiler was originally placed in sand, then placed on a slab, which may have caused stresses in the boiler gas system causing gas to leak.

[21] SVB notes that Rule 507 of the Michigan Boiler Rules requires that "[a] boiler that is 30 years old shall, at the intervals stated in this rule, have all . . . boiler supports and attachments *exposed* for inspection" (emphasis added). Ex. BBB.

On February 27, 2000, Nancy Fisher, an insurance claim adjustor with St. Paul, sent a fax to Dobransky concerning an insurance policy issued by St. Paul. Ex. 26. St. Paul had issued a stand-alone property insurance policy covering the Clara Barton property,[22] but excluding the boiler. Fisher's fax informed Dobransky that St. Paul had made payments totaling $420,000 in connection with the Clara Barton explosion, and that it was continuing to investigate the cause of the explosion. *Id.* Fisher noted that she had been informed that Clara Barton also had an insurance policy with HSB, and that "we may seek reimbursement for the amount of loss paid under St. Paul Insurance policy, in whole or in part." *Id.*

Watkins interpreted the fax, which was in HSB's claims file, to be a coverage contribution letter, not a letter regarding a possible negligent inspection claim. Most property insurance policies exclude coverage for pressure vessel explosions, and equipment breakdown policies are designed to fill that gap. Therefore, if an explosion were caused by a pressure vessel, HSB would reimburse the insured, whereas if the explosion were caused by some other source, the property insurer (St. Paul) would reimburse the insured. Watkins presumed that the letter was St. Paul's attempt to say that it had already paid the insured, but that if it were determined that the Clara Barton explosion was caused by the pressure vessel, St. Paul would expect reimbursement from HSB. In other words, the letter was meant to advise HSB that St. Paul might seek contribution from HSB if it turned out that HSB's policy provided coverage for the incident.

---

[22] Technically, the St. Paul policy was with the Continuum of Flint, a company responsible for Clara Barton.

Watkins did not believe that St. Paul's letter was a subrogation letter.[23]  A subrogation letter is typically filed after a coverage determination has been made, which had not occurred yet.  Furthermore, a subrogation letter typically has language along the lines of, "we believe your negligence has caused this loss, and we will be seeking recovery from you.  Please put your liability carrier on notice."  Finally, a subrogation letter would normally be written by the subrogation department.  At that time, St. Paul had such a department, but its subrogation department did not issue the February 27, 2000 letter to HSB.

The distinction between subrogation letters and coverage letters is important, because only a subrogation action or other negligent inspection action would have implicated HSB's insurance policy with SVB.  SVB's policy with HSB only covered wrongful acts by HSB in connection with professional services it offered.  *See* ex. 6 at 5 ("Underwriters shall reimburse the Insureds . . . for a *Wrongful Act* by the Insureds or by a person or entity for whom the Insureds are legally responsible in the rendering of or failure to render Professional Services, provided such Wrongful Act occurred, or is alleged to have occurred, prior to the 1st December 2000.") (emphasis added).  Thus, a subrogation or other negligent inspection action against HSB would be covered under the SVB policy.  Coverage actions, on the other hand, did not implicate the SVB policy.  If HSB had entered into a coverage dispute with St. Paul, SVB would not have been responsible for those expenses.

On February 27, 2000, Fisher also sent Dobransky a letter suggesting that parties interested in the Clara Barton explosion, including HSB, share the cost of the cause and origin investigation that St. Paul had incurred.  Ex. 86.  Fisher sought contribution from a total of nine

---

[23] "Subrogation" refers to a situation in which an insurance company assumes the insured's rights against a third party.  In this circumstance, a subrogation action would have meant St. Paul had assumed Clara Barton's or some other third party's right to sue HSB for any negligent inspection.

parties, including HSB, Continuum of Flint (the building operator), and Consumers Energy (Clara Barton's gas provider). According to Watkins, when property carriers investigate an explosion, it is typical for them to seek contribution from every party who might benefit from the investigation. She did not believe the cost-sharing proposal indicated that St. Paul would pursue a negligence or subrogation claim against HSB.

### 4. *HSB's and Withers' Final Determinations*

On March 1, 2000, HSB denied coverage for the Clara Barton incident, because it had concluded that the boiler had not exploded, and that the damage had instead come from the accumulation and ignition of natural gas. *See* ex. 80. Watkins was involved in drafting the coverage denial letter. At no time between March 1, 2000 and December 1, 2000 did anyone affiliated with Clara Barton tell HSB that it disagreed with the denial of coverage.

On April 25, 2000, Withers notified Watkins that he had concluded his work on the Clara Barton investigation. Ex. 28. He wrote, "[e]very indication we have indicates that this was a natural gas explosion, which did not rupture the pressure retaining portions of either of the two boilers HSB insured at this location. Assuming that this is accurate *it seems unlikely that HSB would be named as a defendant in any future lawsuits*." *Id*. (emphasis added). From that point until December 1, 2000 Withers never told the HSB law department that he had changed his opinion. In fact, prior to December 1, 2000, no one told Watkins that it was reasonable to expect a lawsuit against HSB to arise from the Clara Barton explosion. Watkins agreed with Withers' conclusion that it was unlikely a lawsuit would be brought against HSB.

### 5. *Requests for Information*

Throughout the Clara Barton investigation, HSB fielded requests from individuals who were attempting to determine the cause of the explosion. For instance, in December 1999,

Dobransky was contacted by Barry Sutton, an attorney for the Continuum of Flint. Ex. O. Sutton informed Dobransky that he had been in touch with the Flint Fire Department, which was interested in having the MDCIS inspect the boiler and boiler parts. *Id.* Sutton also said that there had been a request for the boiler maintenance records. *Id.*

Withers did not believe such requests actually involved the boiler itself. People use "boiler" colloquially to refer to things other than the pressurized vessel, including the gas train and its appliances, which HSB did not consider to be part of the boiler.[24] Instead, HSB only inspects and insures the pressurized vessel itself. Withers did not believe that the Flint Fire Department actually wanted to inspect the vessel that HSB had inspected and insured, but instead wanted to inspect parts that were near or attached to the pressurized vessel. Because the boiler itself had clearly not exploded, he saw no reason for others to inspect the boiler. Instead, because it appeared the explosion had been caused by a gas buildup, he believed investigators would want to test apparatuses such as the gas train.

Some individuals requested copies of Wathan's final inspection report or other maintenance records relating to the event. *See* ex. 85 (fax from Dobransky to Pranulis, dated February 24, 2000, indicating that Scott Feringa, counsel for Consumers Energy, had requested copies of the inspection report); ex. 90 (voicemail from Jack Voss, the insurance broker for the Continuum of Flint, dated March 10, 2000, requesting HSB's inspection report); ex. 95 (fax from

---

[24] Watkins also testified that people often use "boiler" to refer to things not technically part of the pressure vessel. The Michigan Boiler Act of 1965 defines "boiler" as "a closed vessel in which water is heated, steam is generated, steam is superheated, or a combination thereof, under pressure or vacuum by the application of heat from combustible fuels, electricity, or nuclear energy. Boiler does not include facilities of an integral part of a continuous processing unit but does include a fired unit for heating or vaporizing liquids other than water, if the unit is separate from a processing system and is complete within itself." Ex. BBB. Occasionally, a steel shell, or skin, runs around the pressurized vessel. The skin also may go around the furnace piece, which HSB does not consider to be part of the boiler.

Feringa to Dobransky, dated March 17, 2000, stating that Consumers Energy would like copies of the boiler's maintenance records); ex. 98 (letter from Kim Snover, attorney representing two people killed or injured in the explosion, to Dobransky, dated May 9, 2000, requesting copies of the inspection report); ex. NN (letter from Dennis Goebel, attorney for Clara Barton, to Dobransky, dated August 30, 2000, and requesting photos of the "heater boiler"); ex. 110 (fax from Dobransky to Withers, dated November 13, 2000, forwarding a notice from the "Records Deposition Service" seeking the entire insurance file). Watkins was informed of at least some of these requests.

Most of the requests were denied, but HSB informed the inquirers that copies of the inspection report were on file with the state. *See* exs. 91-92, 99. Withers testified that he believed interested parties were requesting copies of the maintenance and inspection records because they were investigating the incident, not because they were hoping to bring litigation against HSB. He suspected that some litigation might result from the explosion, but did not believe it would be directed at HSB. The requests did not cause either Withers or Watkins to reopen their Clara Barton files. Watkins testified that HSB receives hundreds of requests for information, inspection reports, and claim files, and that those requests rarely lead to litigation against HSB.

### 6. *Boiler Testing*

On two different occasions, HSB was informed that investigators wished to perform tests of the Clara Barton "boiler," or related parts. The first involved efforts by Goebel and others to orchestrate testing for interested parties. Goebel spent several months attempting to schedule the testing, which ultimately occurred in June 2000. *See* ex. R (fax from James Brunner of Consumers Energy to Dobransky, dated February 10, 2000, noting that at a February 9 gathering

there had been a discussion of testing "the boilers and related equipment held in storage in Flint"); ex. S (voicemail from Voss to Dobransky, dated February 16, 2000, stating that a meeting would be held in mid-March to examine the boilers); ex. 157 (letter from Engineering and Design Testing Corporation to various individuals including Dobransky, dated March 14, 2000, stating that, although the inspection had originally been scheduled for March, it would have to be rescheduled); ex. 96 (letter from Feringa to interested parties, including Dobransky, dated April 7, 2000, trying to set up inspection and testing of the boiler controls, gas valve, and pressure regulator); ex. 97 (May 3, 2000 letter from Goebel to interested parties, including Dobransky, arranging to inspect "boiler" on June 22, 2000); ex. 100 (letter from Feringa to Meyers, copying interested parties, including Dobransky, dated May 18, 2000, responding to Meyers' inquiry whether the "boiler" would be moved from its present location to allow for inspection and testing); ex. 101 (June 13, 2000 letter from Goebel to interested parties, including Dobransky, arranging to inspect "boiler" June 22, 2000).  No representative from HSB attended that inspection, although Dobransky and Withers received a copy of the sign-in sheet.  Ex. 102. In attendance were Consumers Energy, Continuum of Flint, Ventas (the Clara Barton building owner), and Rockwell and Honeywell (manufacturers of the gas meter and pressure valves).  *Id*. Also in attendance were plaintiffs' attorneys.

Again, Withers testified that, although the letters often said "the boiler" would be tested, people were using the word colloquially, and did not necessarily mean the pressurized vessel itself.  For instance, the March 14, 2000 letter from Engineering and Testing Corporation referenced the "metallurgic testing of pressure regulator and century valve," which are parts of the gas system, not the pressurized vessel.  Ex. 157.  Withers would not have been surprised at

the presence of plaintiffs' attorneys at the testing, because he expected there would be some litigation. He did not, however, expect the litigation would involve HSB.

In the late-summer and fall of 2000, Goebel also informed Dobransky about Consumers Energy's metallurgical testing of certain parts stored at Flint Riggers. *See* ex. 103 (letter from Goebel to interested parties, including Dobransky, dated August 29, 2000, stating that Consumers Energy had requested to perform metallurgical testing of certain parts); ex. 108 (letter from Goebel to interested parties, including Dobransky, dated September 18, 2000, stating that Consumers Energy took possession of parts to have them tested). Most of the parts tested were not part of HSB's definition of the boiler, although six pieces of boiler *supports* were tested. *Id.* (listing parts including pieces of gas pipe, regulator valve, and burner pieces). Up until December 1, 2000, to the best of the HSB law department's knowledge, no one had performed testing of the pressurized vessel itself.

According to Watkins, HSB performs half a million inspections a year and annually receives notice of 80-100 incidents involving bodily injury, death, or property damage where HSB has performed on-site inspections. Despite that, HSB is involved in fewer than six negligence suits a year. Lawsuits are relatively infrequent because HSB does fairly limited inspections: HSB inspectors only look for pressure failures, and do not inspect gas trains, piping, burners, or furnace chambers. Thus, despite the explosion at Clara Barton, and despite the fact that there was testing conducted on parts connected to the boiler, Watkins did not expect HSB to be sued.

### B. Reasonable Expectation of Professional in Position of HSB

Given the circumstances known to HSB's law department as of December 1, 2000, a reasonable professional in the department's position would not reasonably have expected a claim

to arise from the Clara Barton explosion. HSB's only involvement with Clara Barton's boiler, aside from insuring it, was to perform a jurisdictional inspection, which no one at the time alleged had been done negligently. Furthermore, all HSB employees or independent contractors who investigated the explosion had determined that it was not caused by the boiler, but instead was caused by a buildup of natural gas. That conclusion was supported by a report of the MDCIS, and area newspapers. And, persuasively, the attorney the HSB law department had hired for the specific purpose of determining its potential liability had concluded that it was "unlikely that HSB would be named as a defendant in any future lawsuits."

It is true that the Clara Barton explosion was a catastrophic event, and that such events are frequently followed by lawsuits against all potentially responsible parties. Yet the evidence available to HSB reasonably indicated that it would not be the subject of such a lawsuit. Although HSB employees had received letters from potential plaintiffs and potential defendants discussing "boiler" inspections, for the most part it was not the boiler itself that was being inspected, but ancillary equipment. To the extent that the law department learned of other requests for information, it was reasonable for the department to assume the requests were merely investigatory, and that the inquirers would eventually conclude another entity or entities should be held liable. Accordingly, the circumstances known to HSB's office of general counsel as of December 1, 2000 would not reasonably be expected to give rise to a claim against HSB covered by the SVB policy.

This is particularly true because HSB's policy with SVB was an E&O policy; HSB could only recover from SVB for negligent inspection claims, not for other possible bases of liability, such as an explosion of the boiler unrelated to a faulty inspection. At the time of contract

formation, HSB's law department had no reason to believe HSB had been negligent, and thus, that a covered claim might be forthcoming.

One person, LaBelle, did hypothesize that a collapsing boiler stand could have been responsible for the second explosion, which led to most of the damage at Clara Barton. Assuming *arguendo* that the boiler stand *was* part of the required boiler inspection, one could extrapolate from LaBelle's theory that the stand would not have collapsed but for a negligent inspection, and, therefore, that HSB was responsible for the damage. But Withers and Dobransky, the HSB employees who learned of LaBelle's theory, believed it to be unlikely. Furthermore, there is no evidence that LaBelle's theory was conveyed to the law department. There is also no evidence that the law department had knowledge of the facts underlying LaBelle's theory, which would have theoretically enabled it to arrive at the same conclusion.

Although Watkins may have known that Consumers Energy had taken possession of the boiler's supports to have them tested, Consumers Energy had also taken possession of a long list of other parts, including several pieces of the burner apparatus. There is little to suggest that Watkins, or other members of the law department, had reason to believe others were focusing on the boiler supports as a likely cause of the explosion.

The benefit of hindsight makes it easy to speculate that, because HSB eventually was sued by several different plaintiffs, HSB should have anticipated the litigation against it. Yet there is a difference between expecting litigation – believing that it is likely occur – and knowing that litigation is within the realm of possibility. Although perhaps HSB should have known litigation was possible, SVB has not demonstrated that HSB reasonably should have expected it as of December 1, 2000.

C. <u>Contract Damages</u>

The factual evidence demonstrates that an objective professional possessing HSB's knowledge on December 1, 2000 would not reasonably have expected the Clara Barton explosion to result in litigation against HSB. Thus, Exclusion M does not apply, [25] and "Underwriters shall reimburse the Insureds for Loss which is in excess of the Retention Amount." Accordingly, SVB is liable to HSB for its share of the costs HSB incurred arising from the explosion.

The parties have stipulated that SVB's policy with HSB covered "damages, settlements and Defense Costs." Joint Pre-Trial Mem. at ¶ 10. During trial, the parties stipulated that HSB had incurred, exclusive of interest, $1.3 million for the St. Paul arbitration, $2.2 million in defense costs, and $7,394,000 for the Clara Barton litigation. The policy between HSB and SVB provided for a $5 million self-insured retention amount, Joint Pre-Trial Mem. at ¶ 14, bringing HSB's total contract damages to $5,894,667.[26]

The defendant agrees that, as a matter of fact, HSB's contract damages total $5,894,667. Response of Def. SVB Underwriting, LTD. to Pl. HSB Group, Inc.'s Statement Supp. an Award of Prejudgment Interest in the Amount of $3,335,992 at 1-2. SVB was only one of several underwriters at Lloyd's who subscribed to the policy in question, and SVB's share of any loss is 19.032664%. *Id.* at 2-3; Reply Brief of Pl. HSB Group, Inc. Supp. an Award of Prejudgment

---

[25] Because Exclusion M does not apply to the Clara Barton explosion, SVB's only remaining counterclaim fails.

[26] The trial transcript states that total stipulated damages were $5,894,000. At trial, HSB's attorney presented damages visually on a poster board, which the defendant approved. Likely the discrepancy arises because HSB's attorney, when reading the damages out loud, rounded the number. Notes taken by the court indicate that the correct figure is $5,894,667. That figure is reflected in both the plaintiff's and defendant's briefs. *See* Proposed Findings of Fact & Conclusions of Law of Pl. HSB Group, Inc., at 1; Response of Def. SVB Underwriting, Ltd. to Pl. HSB Group, Inc.'s Statement Supp. an Award of Prejudgment Interest in the Amount of $3,335,992, at 2.

Interest in the Amount of $3,335,992.  Therefore, SVB is liable for contract damages of $1,121,912.16.

D. Interest

HSB now seeks to add ten percent prejudgment interest to its damages.  HSB argues that its damages have always been known to SVB, and that despite its contractual obligation, SVB wrongly withheld the sums owed to HSB.  Pl. HSB Group, Inc.'s Statement Supp. an Award of Prejudgment Interest in the Amount of $3,335,992.

Under Connecticut law, "interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable."  Conn. Gen. Stat. § 37-3a.  Before it can award interest, a court must first determine "(1) whether the party against whom interest is sought has wrongfully detained money due the other party; and (2) the date upon which the wrongful detention began in order to determine the time from which interest should be calculated."  *Sears Roebuck & Co. v. Bd. of Tax Review*, 241 Conn. 749, 763 (1997).  If I determine that interest is appropriate in this case, I have the discretion to award up to ten percent interest, but also the discretion to award less.  *Id*. at 765-66.

Although SVB did not refuse to pay HSB's expenses arising from the Clara Barton litigation in bad faith, some interest is due here.  During the time SVB wrongfully refused to reimburse HSB,  HSB was deprived of the opportunity to use and earn interest on the money it was owed.  *See Hartford Steam Boiler Inspection & Ins. Co. v. Underwriters at Lloyd's & Cos. Collective*, 121 Conn. App. 31, 61-62 (2010) (holding it was not abuse of discretion for trial court to award prejudgment interest even though there had been no bad faith, because

"defendants were deprived of [the money's] use and opportunity to earn interest upon it for six years"). I will therefore award prejudgment interest at a rate of four percent.

We must next determine from what date the four percent interest begins to run. The parties do not dispute that SVB never formally denied HSB's request for coverage. Instead, on September 7, 2004, SVB acknowledged HSB's request for coverage of the individuals' lawsuits settlement, but said that it would have to conduct an investigation to see if Exclusion M applied. On December 16, 2004, the instant lawsuit was filed. Because SVB contested the lawsuit, I will use the date of the lawsuit as the date from which SVB detained the settlement money due HSB. At that point, HSB had incurred $7,394,667.00 from lawsuits, and $2 million for defenses costs. After subtracting the $5 million self-insured retention amount, the amount owed on that date was $4,394,667. SVB's share of that amount was $836,422.20. Interest in that amount equals $220,257.84 for September 7, 2004 to April 7, 2011, and $91.66 per day for every day after.

On August 5, 2006, HSB resolved the St. Paul subrogation suit. Because SVB did not reimburse HSB for those costs, on that date HSB was owed $1.3 million, plus $200,000 defense costs. SVB's share of that sum was $285,489.96. Interest in that amount equals $53,291.46 for August 5, 2006 to April 5, 2011, and $31.29 per day for every day after.

## III. Conclusion

For the reasons stated above, SVB Underwriting, Ltd. is liable for breach of contract to HSB Group, Inc. Exclusion M does not apply in this case, and SVB is liable to HSB for damages arising from the Clara Barton litigation. SVB Underwriting, therefore, must pay

$1,121,912.16 in damages plus $273,611.88 in interest[27] to HSB Group, Inc.  For every day after

April 7, 2011 until the judgment enters, HSB will be awarded an additional $122.95 per day.[28]

The clerk shall enter judgment and close the file.

It is so ordered.

Dated at Bridgeport, Connecticut, this 19th day of May 2011.


/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge

---

[27] This figure was arrived at by adding $220,257.84 (the interest amount on the individuals' lawsuits and settlement for September 7, 2004 to April 7, 2011), $53,291.46 (the interest amount on the subrogation suit from August 5, 2006 to April 5, 2011), and $62.58 (the interest owed for the subrogation award from April 5, 2011 to April 7, 2011).

[28] This figure was arrived at by adding $91.66 (the daily amount of interest on the lawsuits and settlement) and $31.29 (the daily amount of interest on the subrogation award).